GEARY ET AL., RESPONDENTS, v. HARPER ET AL., DEFENDANTS; DILTS, APPELLANT.

(No. 6,923.)

(Submitted March 19, 1932. Decided June 11, 1932.)

[12 Pac. (2d) 276.]

*Mr. E. M. Keeley,* for Appellant, submitted a brief and argued the cause orally.

*Mr. S. P. Wilson,* for Respondents (Plaintiffs), and *Mr. K. W. Macpherson,* for Respondent (Defendant) William Praast, submitted a brief and argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Mary J. Geary and others, as the heirs at law of Daniel Geary, brought suit against William Praast, Willis Dilts, Virgil Harper, Kate L. Shellooe, Joseph Harper and others to secure a decree fixing and determining the respective rights of the parties, plaintiffs and defendants, in and to the waters of Ward Creek, in Powell county.

The plaintiffs alleged that they had rights superior to all of the defendants, and prayed that they be decreed 200 miner's inches of the waters of the creek as of date May 1, 1880, a like amount as of May 5, 1886, and a like amount as of May 24, 1893.

With the exception of those named above, the defendants suffered default to be entered against them; those mentioned answered, setting up the rights claimed by them. Praast claimed 800 miner's inches as of date July 12, 1887; Dilts, 300 miner's inches as of date 1882, and the Harpers and Kate L. Shellooe, as tenants in common, claimed all of the waters of "Meadow or Bull Creek, sometimes called "Wild Rose Creek," by appropriation in 1888, and by adverse user as against all other parties to the suit.

On the trial each of the parties appearing introduced oral and documentary evidence, from which the court made the customary findings, followed by specific findings, to-wit:

(1) Geary rights: (a) 50 inches of date October 1, 1882, through Geary ditch No. 1; (b) 15 inches of date October 1,

1883, through Geary ditch No. 2; and (c) 25 inches of date June 18, 1897, through McIlree Ranch ditch.

(2) Praast rights: (a) 125 inches of date July 12, 1887, through Praast ditch No. 1; (b) 35 inches of date July 1, 1896, through Praast ditch No. 2.

(3) Harper right: 55 inches as of July 1, 1911.

(4) Dilts right: 65 inches as of date May 1, 1917.

The court found that the upper portion of Ward Creek had sometimes been called Meadow Creek, Bull Creek and Wild Rose Creek, but that there is but the one creek, and found against all claims for "developed water" and claims of right by adverse user.

The findings were followed by appropriate conclusions of law, and on these the usual decree was duly entered.

Defendant Dilts alone has appealed from the judgment; he challenges the correctness of each of the special findings above and of the corresponding conclusions of law; asserts that the evidence is insufficient to warrant any of the findings or the decree as entered; and specifies error on the admission of certain testimony.

Ward Creek is a small tributary of the north fork of the Blackfoot River; it rises in the mountains and flows in a southwesterly direction through, consecutively, sections 2, 10, 16, 9 and 8, of township 14 north, of range 11 west, in Powell county. At the northeast corner of section 10 it flows through swamp-lands and forms a small lake known as "Dead Man's Lake"; near the center of section 16 the creek forks, one branch continuing in a southwesterly direction and flowing into "Brown's Lake," the other flowing in a northwesterly direction to and across what is known as "Kleinschmidt's Flat."

Sam Ward, after whom the creek is named, was the first settler thereon; he located on the southeast quarter of section 10, below Dead Man's Lake, in 1880, and secured patent therefor in 1889; he lived there a number of years, and then

sold to Marcum and Lannen, who in turn sold to one Fleming, from whom defendant Dilts obtained title.

Sam Thompson located on the northeast quarter of section 16, a school section, in 1882; in 1892 he quitclaimed all his right, title and interest in the land, improvements, ditches and water rights to Charles Wood, George Dice and M. Hanley. The Gearys claim certain rights through transfer from these vendees, hereinafter discussed. Mrs. Geary still holds and operates the school land under lease from the state.

Clinton McIlree located on the northeast quarter of section 10, some time prior to 1897, secured patent, and thereafter deeded the land and water rights appurtenant thereto to Daniel Geary, predecessor in interest of Mary J. Geary.

Maxwell Brooks located upon the southwest quarter of section 2 in 1888, and received patent therefor in 1904; he conveyed to Harper and Shellooe.

William H. Murphy located on lands in section 8, in 1887 or prior thereto, and secured patent therefor in 1892; by mesne conveyances Praast succeeded Murphy in 1896.

*Geary Rights:*

Rights (a) and (b) above are based upon appropriations ▮ made by Sam Thompson. These appropriations are described in the quitclaim deed from Thompson to Wood, Dice and Hanley, as having been made in 1886 and 1888, instead of in 1882 and 1883 as found by the court, and notices of appropriation as of those dates were introduced in evience. However, oral evidence of a substantial nature was introduced showing the construction of ditch No. 1 (right a) by Thompson in 1882, and of ditch No. 2 (right b) in 1883, and the irrigation of parts of the school section through those ditches, commencing with their construction and continuing down to the time of the trial. The recitations in the deed and in the notices do not establish the right. In the face of oral testimony to the contrary, satisfactorily establishing the facts, it could not successfully be contended that, were the conditions reversed, the plaintiffs could have, by

the documentary evidence, established rights antedating the actual appropriation of the water. These declarations may be considered as declarations against interest, and, for that reason, given weight, but, unless it is found that the appealing defendant has established some right antedating 1883, he is in no position to urge error; if error was committed, it was error without prejudice.

However, it is contended that the plaintiffs did not prove ▮ title, in that they failed to show a valid transfer to Geary of the Wood, Dice and Hanley rights, and that the court erred in overruling counsel's motion to strike all evidence tending to prove an oral conveyance. This evidence is to the effect that Wood and Dice were partners in the butcher business at Elliston and desired to have a place where they could hold beef cattle. Hanley was a farmer. On securing the quitclaim deed, Hanley moved upon the school section with his family and operated it for a year, raising hay, oats and garden truck. Wood pastured some cattle upon it. Mrs. Hanley was dissatisfied, so Hanley sold out to Geary; he testified that a "bill of sale was made out," and "he must have signed it" and delivered it to Geary. Mrs. Geary testified to a diligent search for such an instrument, but that she was unable to find it. However, at the outset counsel for the Gearys stated that they relied upon an oral conveyance.

After Hanley had sold out, Wood sought to sell his interest to Geary and, failing, "gave it" to him, evidencing the transfer by delivery of the Thompson deed. Dice did not join in this informal conveyance, but both Hanley and Wood testified that Dice had "nothing to do" with the property; that he was but a partner in the butcher business; he died many years before the trial.

Appellant contends that the purported transfer comes within the statute of frauds, and all evidence of it should have been stricken.

Section 7593, Revised Codes 1921, declares that "no agreement for the sale of real property, or of any interest therein,

is valid, unless the same, or some note or memorandum thereof, be in writing.''

Counsel relies upon the rule, based upon the construction placed upon what is said in *Barkley* v. *Tieleke*, 2 Mont. 59, and *Prentice* v. *McKay*, 38 Mont. 114, 98 Pac. 1081, in 4 Morrison's Mining Reports, 666, and Black's Pomeroy on Water Rights, section 97, note, to-wit, that an oral grant passes no interest in a ditch, but amounts to an abandonment of the water right as of that date and a new appropriation by the grantee.

The declaration in *Barkley* v. *Tieleke* was discussed and the correctness of the above construction ''doubted'' in *McDonald* v. *Lannen*, 19 Mont. 78, 47 Pac. 648, 649, where the decision is expressly ''disapproved at least in so far as it affects conflicting water rights of the present character.''

In *Prentice* v. *McKay*, the question of oral conveyance was not before the court, rather the right of a land owner to acquire an easement by trespass. In the case before us, there was no trespass; the land on which Thompson made his appropriation was public domain and his right to an easement was not questioned; nor could it be. (*McDonald* v. *Lannen*, above.)

Agreements respecting improvements erected by the vendor upon public lands in which he has no permanent interest are not within the statute of frauds (27 C. J. 197, and cases cited); and this court is committed to the doctrine that a settler upon public lands of the United States may convey his right therein, with water rights thereto appurtenant, orally and with or without consideration, to one who thereupon takes immediate possession thereof. (*Wood* v. *Lowney*, 20 Mont. 273, 50 Pac. 794; *Featherman* v. *Hennessy*, 42 Mont. 535, 113 Pac. 751; *St. Onge* v. *Blakely*, 76 Mont. 1, 245 Pac. 532.)

The evidence as to the manner in which Daniel Geary acquired title was properly admitted and is sufficient to establish the Geary rights (a) and (b).

Right (c) is based upon a legal appropriation by Clinton McIlree as of the date decreed. Some question is raised as to there being no ditch, but there is substantial evidence of

its existence, and the finding thereon cannot be disturbed. The confusion as to this right arose over the fact that the surveyor who went over the land and prepared a map used on the trial failed to note the ditch on his map; this failure was probably due to facts hereinafter shown.

*Praast Rights:*

The first contention here is that Praast holds only high-water rights, to which there is no merit.

It is next asserted that of 250 inches of water going past the Dilts place but 15 would reach the Praast place and would be of no benefit, and that to require the holders on the upper reaches of the creek to permit the water to flow down to Praast under these circumstances is contrary to the policy of requiring the fullest beneficial use of water. (*Raymond* v. *Wimsette,* 12 Mont. 551, 33 Am. St. Rep. 604, 31 Pac. 537; *Allen* v. *Petrick,* 69 Mont. 373, 222 Pac. 451.) It is true that there is evidence in the record to the effect that a small amount of water would be useless, as it would sink before reaching the Praast land; but the evidence as a whole does not show conditions substantially different from those generally existing in irrigating areas nor warranting the deduction drawn.

*Harper Right:*

This right is not challenged.

*Dilts Right:*

The appellant contends that his right should antedate all others, as it was initiated by Sam Ward, the first settler on the creek, in 1882, and before any other right was acquired, or, at worst, should have been awarded as of the year 1891. This contention is based upon the testimony of appellant Dilts and a notice of appropriation recorded by his predecessors, Marcum and Lannen, in 1893. It is urged that this notice was proof that the right was initiated by Ward in 1882, relying upon the declaration that such a notice is "admissible as evidence tending to show the intention, understanding, and action of the original appropriators." (*Sweetland.* v. *Olsen,* 11 Mont. 27, 27 Pac. 339.) The fallacy of this contention

lies in the fact that the notice was not recorded by the supposed original appropriator and the recitations therein contained are merely hearsay. Marcum and Lannen declare that they have a legal right to the use of and claim 300 inches of the waters of Ward Creek by virtue of its appropriation and use by Ward in 1882 and that *"we* have taken said water out of, and diverted it from said creek by means of a headgate" which "taps and diverts the water from said stream at a point on its right bank at a lake formed by said stream and a beaver dam" into an old channel "thence running, or to run, to and upon said land"; that they claim the "lake" as a reservoir. Marcum and Lannen acquired the Ward property in 1890, and there is nothing in the record to indicate that either of them had any knowledge as to what had there transpired prior to that time.

The notice is not such as was considered in the *Sweetland Case,* above, and does not even "tend" to prove the acts of the original appropriator.

Dilts did not acquire the property until 1916, but he testified that he visited the land in 1891, and that, at that time, the headgate had been installed diverting water from the dam into the dry channel, from which it spread out on the land by means of a dam placed in the dry channel. This constitutes what counsel terms the flood system of irrigating. His counsel sought, by leading questions, to secure a statement from the witness that he saw ditches on the ground, but, while he answered in the affirmative as to certain questions, he clearly indicated that the foregoing statement reveals all that he claims to have seen at that time; he testified that, to his knowledge, some irrigation had been carried on each year since 1891. There is some testimony as to the overflow of the creek and the flooding of the meadows prior to 1891, and cutting hay thereon by Ward, but this testimony is of little positive force, as it would seem that the flooding was probably the result of the activity of the beavers rather than that of humans, and that, in early days, one could cut hay anywhere in the neighborhood without the necessity of irrigating the land.

On the other hand, there is positive testimony in the record to the effect that there was no irrigating on the Ward place up to and including the year 1897.

While the above testimony on behalf of Dilts might warrant dating his right back as far as 1891, the court was at liberty to discard his testimony in favor of that produced by the other parties to the suit, and, consequently, we cannot say that error was committed in fixing the Dilts right as of date subsequent to 1897.

However, Dilts purchased from David Fleming in 1916, and Fleming, in turn, purchased from Marcum and Lannen in 1902. Mrs. Geary on cross-examination testified that "Dave Fleming, when Mr. Marcum sold out to him, he plowed through my place without my consent and he plowed into my ditch, and that is the ditch Mr. Dilts has. That is all the ditch there is on the ranch" (the McIlree quarter-section). This is one of the ditches because of which Dilts was awarded a right as of May, 1917. There seems to be no substantial conflict in the evidence as to the right from 1902 on; the use seems to have been the same prior to 1917 as it has been since, so far as is disclosed by the evidence. The ditch to which Mrs. Geary made reference would seem to be the ditch through which Geary and his successors used the McIlree water right, and from evidence, believed by the court, this ditch must have been used by both Geary and Dilts.

While a right cannot be initiated by trespass, a right by prescription may be acquired by adverse user of a ditch across the lands of another for the full period required by the statute to bar an action with respect to real property. (*Scott* v. *Jardine Gold Min. Co.*, 79 Mont. 485, 257 Pac. 406; *Hays* v. *DeAtley*, 65 Mont. 558, 212 Pac. 296; *Babcock* v. *Gregg*, 55 Mont. 317, 178 Pac. 284.)

The record discloses that, for more than the required ten years prior to the time he sold to Dilts, Fleming asserted the right to use, and did use, a ditch constructed by him across the McIlree place, of which he made the McIlree ditch a part, with the knowledge and without the consent of Geary. As

the court found on substantial testimony that Geary and his successors have used the water right appropriated by McIlree, there must have been a joint use thereof; while Fleming acquired a right by prescription in and to the whole ditch, Geary's successors still own that portion of the ditch which constitutes an enlargement of the McIlree ditch, and, consequently, these parties are tenants in common of the ditch. (*Rodda* v. *Best*, 68 Mont. 205, 217 Pac. 669.)

The record establishes the Dilts right, then, as far back as 1902, which date should be given it, rather than that of 1917.

Dilts further objects to that portion of the decree which requires all parties to remove dams and obstructions from the stream when prior appropriators are entitled to the use of the water. This provision can apply only to temporary obstructions for the diversion of water. The law recognizes the right of an appropriator to construct a permanent dam in a stream, when necessary to raise the surface to the level of his headgate, and to maintain the same as a part of his irrigating system (sec. 7110, Rev. Codes 1921), so long as such a dam is constructed and maintained in a safe condition (sec. 7117). Ordinarily, when such a dam is constructed, it retards the flow of the stream only so long as is required to fill the reservoir thus created, and thereafter the water of the stream will flow in undiminished volume when the headgate is closed, or all surplus will pass on to other users after the owner of the headgate has received that to which he is entitled. If the construction is such that this result does not follow, the appropriator maintaining the dam may be required to maintain a spillway or other appropriate means of insuring the natural flow of the stream down to the heads of the ditches of other appropriators at such times as he is not entitled to the use of the water impounded and of that to which those who have right prior to his are entitled at all times. (*Donich* v. *Johnson*, 77 Mont. 229, 250 Pac. 963.)

In this instance the initial retardation was effected at least at the time Dilts' predecessor, Fleming, established his dam

and installed his headgate in 1902, and had probably existed for many years prior thereto by reason of the existence of the beaver dams in the creek. There is nothing in the record to indicate that the preservation of prior rights or the distribution of the water in accordance with the decree herein requires that the Dilts dam should be removed from the bed of the stream; the closing down of his headgate would seem to be all that would be required to divert the water to other ditches; but, if at any future time it becomes necessary that an adequate spillway be constructed, the court may, for the proper distribution of the waters of the stream, require such construction.

Other questions raised have been considered and are found to be without merit.

The cause is remanded to the district court of Powell county, with direction to modify the decree to conform to this opinion, and, as modified, the judgment will be affirmed. Appellant Dilts shall have one-half his costs on appeal, to be divided equally between the successors of Daniel Geary, plaintiffs, and the defendants Harper; otherwise the parties to this proceeding to pay their own costs.

Mr. Chief Justice Callaway and Associate Justices Galen, Ford and Angstman concur.