COOK ET AL., RESPONDENTS, *v.* HUDSON, APPELLANT,

(No. 7,897.)

(Submitted December 11, 1939.   Decided March 14, 1940.)

[103 Pac. (2d) 137.]

Mr. M. L. Parcells, Messrs. Rockwood Brown & Horace S. Davis, Mr. Melvin N. Hoiness and Mr. Franklin S. Longan, for Appellant, submitted briefs; Mr. Parcells and Mr. Davis argued the cause orally.

*Mr. P. R. Heily, Mr. R. G. Wiggenhorn* and *Mr. George J. Hutton,* for Respondents, submitted briefs; *Mr. Wiggenhorn* argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

This is an action to determine which of the two litigants is the owner of the prior right, for irrigation and other useful purposes, of the waters of Grove Creek in Stillwater county.

An adequate foundation for the claim of the first right is set forth in the complaint; uninterrupted enjoyment over a long period of years, injury arising from defendant's invasion of plaintiffs' right, demand made and refused that defendant cease such invasion, are alleged. Plaintiffs pray that defendant be required to set forth the grounds to his claim to the water, for a restraining order and, if the decree be in favor of the plaintiffs, for a permanent injunction enjoining further invasion of plaintiffs' rights and for costs of suit.

Defendant's special and general demurrers were overruled. The answer admits plaintiffs' ownership of the land upon which plaintiffs used the water, and an appropriation by H. I. Grant through whom plaintiffs deraign title, but alleges a fatal break in plaintiffs' chain of title, and otherwise denies generally all the material allegations of the complaint, then sets up five affirmative defenses—two upon right by prescription predicated upon hostile use and upon abandonment by plaintiffs' predecessors in interest, and two as pleas in bar to plaintiffs' alleged right of action by operation of sections 9015 and 9016, Revised Codes, and a fifth upon prior right by appropriation.

Special and general demurrers to the affirmative matter in the answer were overruled. A motion to strike was granted in part. The stricken portion is shown in the record.

The complaint alleges appropriation by plaintiffs' predecessors in interest of 120 inches of the stream by notice recorded as of November 2, 1892, and its use on 160 acres of land described as the E½ NE¼, SW¼ NE¼, and the SE¼ NW¼ of section 18, T. 4 S., R. 18 E., M. M.

The cause was tried to the court sitting with a jury. Twelve special interrogatories were submitted. No answer was returned to interrogatory No. 11, and none was necessary by reason of the negative answer to No. 10. The other interrogatories and respective answers are as follows:

"Interrogatory No. 1: Do you find that H. I. Grant being the person who had a squatter's claim on the land which is now part of the place owned by the plaintiff, made an appropriation of water in manner and form as set forth in the Notice of Appropriation which has been received in evidence as Plaintiff's Exhibit 'G'? (Answer yes or no.) Answer: Yes.

"Interrogatory No. 2: If you have answered Interrogatory Number 1 by the word 'yes', state whether or not water has been used for the irrigation of land under and by virtue of said appropriation. (Answer yes or no.) Answer: Yes.

"Interrogatory No. 3: If you have found that water was used for the irrigation of land under the appropriation made by H. I. Grant, state how many miners inches of water were used, and for what period of time it has been used. (If different amounts for different periods, give amounts and the different years in which used.) Answer: 40 to 120 inches.

"Interrogatory No. 4: If you have found water was used for irrigation, under and by virtue of the H. I. Grant appropriation, what proportion of the waters of Grove Creek were used for such irrigation during the time irrigating was being done? Answer: All at point of diversion.

"Interrogatory No. 5: Do you find that Joe Severin, being the person who has a squatter's claim on the land which is now part of the place owned by the defendant, made an appropriation of water in manner and form as set forth in the Notice of Appropriation which has been received in evidence as Defendant's Exhibit 7? (Answer Yes or No.) Answer: Yes.

"Interrogatory No. 6: If you have answered Interrogatory Number 5 by the word 'yes', state whether or not water has been used for the irrigation of land under and by virtue of said appropriation. (Answer, yes or no.) Answer: Yes.

"Interrogatory No. 7: If you have found that water was used for the irrigation of land under the appropriation made by Joe Severin, state how many miners inches of water were used and for what period of time it has been used. (If different amounts for different periods, give amounts and the different years in which used.) Answer: 15 to 30 inches.

"Interrogatory No. 8: If you have found water was used for irrigation under and by virtue of the Joe Severin appropriation, what proportion of the waters of Grove Creek were used for such irrigation during the time irrigating was being done? Answer: All at point of diversion.

"Interrogatory No. 9: From all the evidence in this case, on which place do you find water has been used for irrigation more continuously and in larger amounts, on the place originally located by H. I. Grant, or on the place originally located by Joe Severin? Answer: H. I. Grant.

"Interrogatory No. 10: Do you find that water was ever used to irrigate land out of the ditches on the so-called Severin place, now owned by defendant, at a time when the occupant of the place now owned by plaintiffs knew that such water was being used, and at a time when such water was then wanted and required for irrigation by the occupant of the Cook place? Answer: No.

"Interrogatory No. 12: From all the evidence in this case, taking into consideration the time of construction of ditches, the size and use to which the ditches were put, and the amount of water used for irrigation, on which place do you find that water out of Grove Creek was *first* used for *general* irrigation, the Cook place or the Hudson place? Answer: T. B. Cook."

The findings of fact and conclusions of law of the court were in substantial accord with the answers returned by the jury to the special interrogatories, in so far as pertinent or applicable. The court found that the plaintiffs' predecessor H. I. Grant ap-

propriated on or prior to October, 1892, and thereafter applied to a beneficial use, 80 inches of the water in the irrigation of Grant's claim and plaintiffs had succeeded to the squatter's title to the lands and the water, deraigning their title to the water through the Grant appropriation and this 80 inches was awarded to the plaintiffs as a first right, prior and superior to any right of the defendant. It was further held that there was never any adverse use by the defendant, and that plaintiffs' rights were not affected by the statute of limitations; that such water as defendant and his predecessors in interest had used out of the stream was used at the sufferance of the plaintiffs and with full recognition of the prior right of the plaintiffs and their predecessors to the extent of the 80 inches decreed to them until the year 1937. The defendant was awarded 60 inches subject to the prior right of the plaintiffs, and defendant and all parties acting under him were permanently enjoined from interfering with plaintiffs' rights. Plaintiffs were allowed their costs. Judgment was entered accordingly and from such judgment the defendant appeals.

Fifty-eight specifications of error are assigned, argued under five enumerated points of law, which will be considered in the order enumerated:

"1. The respondents are not the successors in interest of either John Heide or Sam Dixon, and for want of privity may not claim, in this suit, any waterright out of Grove Creek from Henry I. Grant through either Mr. Heide or Mr. Dixon.

"2. The judgment in the Heide-Carstens suit, which the respondents have pleaded as their title, is binding upon them and establishes the priority of their waterright, if they be successors of Henry Grant, John Heide and Sam Dixon, as not earlier than March 8, 1895.

"3. Henry Grant made no valid appropriation of water from Grove Creek prior to October 21, 1892, the date of the appropriation made by Joseph Severin, the appellant's predecessor, and therefore any right coming to the respondents from Mr. Grant is inferior and junior to the right of the appellant.

"4. The respondents have proved an appropriation and beneficial use at any time of no more than forty-five miner's inches of water as against the appropriation and right of Joseph Severin, the appellant's predecessor of date and priority October 21, 1892.

"5. The costs of this suit in equity for the adjudication of controverted waterrights, claimed by both parties, should be apportioned; and either party should be required to pay his own costs without recovery over."

1. Taking up the consideration of the first of the five points of law submitted, the record shows a break in the chain of title to the water right initiated by Grant when one of his successors in interest, Dixon, surrendered possession of the lands described in the complaint to one of the predecessors in interest to the plaintiff, Magee.

Henry I. Grant initiated the water right upon which plaintiffs ground their claim of priority, Grant's notice of appropriation, as it appears in the record, was acknowledged October 31, 1892, recorded in the miscellaneous records of Carbon county November 2, 1892 (afterwards transferred to the records of Stillwater county), and such notice recites that the appropriation was made as of October 20, 1892. Three hundred miner's inches of water were claimed. The lands on which it was to be used, being unsurveyed, were described by metes and bounds, and the point of diversion was likewise described by metes and bounds of the adjoining land and by certain posts alleged to have been set up at that time. The diversion ditch is described as being 36 inches on the bottom and 12 inches deep. Grant had simply a squatter's right on the land, and he afterwards sold and conveyed such right along with his water right to A. L. Lind for $500. Lind sold and conveyed the same property to John Heide for $500. While Heide was in possession of the premises an action contesting his water right was tried. After that suit resulting in his favor, Heide conveyed his claim, with certain enumerated personal property in the way of household effects, implements and machinery, to Sam Dixon for $2,300.

These several conveyances are shown by plaintiffs' exhibits "A," "B," and "C."

Each conveyance shows the water right expressly included. Each of the exhibits mentioned was admitted over defendant's objection. The objections were predicated upon the ground that the water right referred to in the instruments of conveyance was not a right acquired by or through the record appropriation made by Henry I. Grant. This contention arises from the admitted fact that the plaintiffs in their proof could show no record or instrument of conveyance of any water right from Dixon to Magee, who succeeded Dixon, in the possession of the land described in the complaint but based their claim of priority upon transfer by parol from Dixon to Magee. Magee had been in partnership with one Price on a ranch or claim some three or four miles from the Dixon land, Price and Magee having dissolved partnership and divided up their property—Magee taking 250 head of cattle that the partnership owned and Price taking the land.

Magee, after running his cattle for a year or two on the open range at a new location, joined Dixon on the ranch that he had purchased from Heide. The evidence is to the effect that the two operated the ranch together, irrigating the lands and cutting and putting up the hay and taking care of their affairs generally together. It is obvious from the testimony that Magee and Dixon were associated together in handling their livestock and running the Dixon ranch under some sort of mutual arrangement. This association continued for a little more than a year, and Dixon then bought a ranch some four or five miles away in the neighborhood of the ranch where Price, the former partner of Magee lived, and while waiting to get possession of the new place that he had purchased he stopped with Price for about a month. While there, according to Price's testimony, Dixon said that he had sold out to Magee and mentioned the price of $2,000. Magee continued on the Dixon place and after the land was thrown open to entry he patented the 160 acres described in the complaint, and died in 1908 leaving a son seven years of age as his only heir. His old partner Price, who was

an intimate friend (the two having come to the county together), administered the Magee estate and reared the Magee son. When the elder Magee died part of his estate consisted of a lease on the Severin ranch. The defendant claims title to the water involved in the controversy through the appropriation made by Severin.

Price, as administrator of the Magee estate, handled the Severin place for one year under the Magee lease, putting up hay and looking after it generally, and the record does not show that the Magee lease on the Severin place remained in force after 1909. In that or the following year Price leased the Magee place to one L. A. Brennan. Brennan was a tenant on the place from 1909 or 1910 to 1924—a period of approximately 14 years—and paid an annual cash rental of from $300 to $400. When Lyle Magee came into possession of his father's ranch in 1924 it appears that he ran it for a time himself and then leased it for some years to other tenants and in 1936 sold it to the plaintiffs.

There is no question that such water right as existed by virtue of the Grant appropriation legally passed and vested in Lind by the Grant conveyance and was then conveyed from Lind to Heide and from Heide to Dixon, but transfer of title of the water right from Dixon to Magee rests entirely upon presumptions grounded on circumstantial evidence. The trial court, after making findings of fact and conclusions of law, made and entered in the record a very able opinion setting out the ground upon which the conclusions of law and decree were based. The following parts of that opinion will aid in obtaining a clearer grasp of the pertinent questions involved in the controversy:

''Evidence was offered by the witness, Robert Price, who testified, over objection, that Dixon after leaving the place occupied by him under his Squatters Right, informed him that he had sold the place to Mr. Magee for a purchase price of around Two Thousand Dollars. The contention is made by the defendant that this testimony was incompetent, irrelevant and immaterial, particularly, because the same is not a declaration against interest, and is in the form of hearsay, which would not be binding

on the defendant or anyone in privity with him. With this contention, under authority of the case of *Osnes Livestock Company* v. *Warren*, 103 Mont. 284, 62 Pac. (2d) 206, the Court is, reluctantly, forced to agree. Such evidence has not been considered in arriving at a decision. If this be error it can easily be corrected on appeal, because such ruling does not militate against the decision in this Court.

"There is, however, other evidence in the record, competent and material, from which the presumption arises that Magee obtained title to the water right in connection with the squatters claim. This evidence established certain presumptions, and these being uncontroverted, make out a case for the plaintiff. The facts proved may be grouped as follows:

"1. The appropriation of H. I. Grant made in 1892 was the first appropriation and use of water out of Grove Creek. (See, also, jury findings.)

"2. The squatters right was sold, each time for a consideration. $500.00 by Grant; same by Lind; Sam Dixon paid $2300.00 for the place, water and some personal property; after Magee's death the place rented for $300.00 to $400.00 a year, for a long period at the turn of the Century (see chain of title and conveyances), and it is fairly deductible from the record that this was relatively valuable property, and that its principal value lay in its water right.

"3. Heide placed such value on the water right that he litigated the question of who had prior right to its use, and established by decree that he owned the water right in 1895.

"4. From time of appropriation by Grant until the present time, water has been used continuously on the Cook place. Water has never been used by Hudson when wanted on Cook place. (See jury interrogatory Number 10.) There has never been any abandonment of the Grant right.

"5. Sam Dixon had a good right to the land and water (see Plaintiff's Exhibit 'C'). He and Magee operated the place together, using land and water, acting as co-partners, and the presumption is they had entered into a contract of co-partnership. (See sec. 10606, sub. 29)

"6. Dixon surrendered possession of place and water to Magee, who continued to operate same, use the water, and finally obtained homestead patent for land and water. (See Plaintiff's Exhibit 'D') Having been in possession of said land and water as a Squatter, the presumption is that the Government, in allowing his homestead entry, recognized his acquired squatters right. (See 50 C. J. 926 (76) and cases cited).

"7. The land and water were used by Magee and his heir without restriction in the use of water, and with a claim to a prior right to its use as against the Hudson Place, from time Dixon left the land until Cook acquired it in 1937.

"8. At all times, both the Cook and Hudson Places required irrigation to raise profitable crops, and the evidence shows that there has not been enough water in Grove Creek to irrigate both places. Nevertheless, as found by the jury, no water was ever used on the Defendant's place when occupants of Plaintiff's place knew of such use, when such water was then wanted and required for use on the Cook Place."

Following this portion of the opinion, the trial court enumerates a number of presumptions found in section 10606, Revised Codes, and of such presumptions so mentioned it is our view that subdivisions 8, 11, 12, and 27 are particularly applicable here. The presumptions mentioned are as follows:

"8. That a thing delivered by one to another belonged to the latter."

"11. That things which a person possesses are owned by him.

"12. That a person is the owner of property from exercising acts of ownership over it, or from common reputation of his ownership."

"27. That acquiescence followed from a belief that the thing acquiesced in was conformable to the right or fact."

In the consideration of cases such as that at bar, we are governed by the rule that the supreme court may examine the evidence and determine a question of fact for itself, but it cannot overturn findings of the trial court unless there is a decided preponderance of the evidence against them (*Bordeaux* v. *Bordeaux*, 32 Mont. 159, 80 Pac. 6; *Finlen* v. *Heinze*, 32 Mont. 354,

80 Pac. 918; *Delmoe v. Long,* 35 Mont. 139, 88 Pac. 778; *Watkins* v. *Watkins,* 39 Mont. 367, 102 Pac. 860; *Copper Mountain Min. & S. Co.* v. *Butte & Corbin Min. Co.,* 39 Mont. 487, 104 Pac. 540, 133 Am. St. Rep. 595; *Murray* v. *Butte-Monitor T. M. Co.,* 41 Mont. 449, 110 Pac. 497, 112 Pac. 1132; *O'Neil* v. *O'Neil,* 43 Mont. 505, 117 Pac. 889, Ann. Cas. 1912C, 268; *Leigland* v. *Rundle L. & A. Co.,* 64 Mont. 154, 208 Pac. 1075; *Kummrow* v. *Bank of Fergus County,* 66 Mont. 434, 214 Pac. 1098), and in such cases when all the evidence is before this court we may, under section 8805, determine a fact upon which the trial court failed to make a finding (*Walsh* v. *Hoskins,* 53 Mont. 198, 162 Pac. 960), and where the contention is made that the evidence is insufficient to support the findings of the trial court we will go no further than to determine whether there is a decided preponderance against the findings and if there be reasonable grounds for differing opinions the decisions will not be disturbed. (*Nolan* v. *Benninghoff,* 64 Mont. 68, 208 Pac. 905.)

(A) Generally speaking, the facts found as set forth in the foregoing excerpt from the trial court's opinion are, with the possible exception presently mentioned, sustained by a clear preponderance of the evidence. It is our view that the alleged break in the chain of title to the water right on the grounds contended is not material when considered in the light of all the circumstances and pertinent statutory presumptions. Admission of the testimony of Price as to the sale by Dixon to Magee as a declaration against interest might be admissible as an exception to the hearsay rule of evidence on the ground of necessity. (See, 3 Wigmore on Evidence, 2d ed., p. 155, sec. 1421, and 20 Am. Jur., sec. 608, p. 521.) But in the case at bar we are not reduced to the application of the necessity rule by reason of the presumptions logically arising from the circumstantial evidence as shown by the record, and for that reason the exclusion of the Price testimony as to the Dixon declaration was proper under the circumstances.

We adopt in substance that part of the opinion of the trial court recited, modified, however, as to the absolute ruling on the exclusion of declarations against interest as applied generally.

It is our opinion that Dixon's statement might be admissible, in some circumstances, under the necessity rule mentioned, but this is stated here merely to save the exception to the rule in cases where it might apply. The strength of plaintiffs' position lies in the following rules of law, when applied to the facts here involved:

The claim and water rights of a squatter can be conveyed by parol. (*Gilcrest* v. *Bowen*, 95 Mont. 44, 24 Pac. (2d) 141; *Geary* v. *Harper*, 92 Mont. 242, 12 Pac. (2d) 276; *Wood* v. *Lowney*, 20 Mont. 273, 50 Pac. 794; *Featherman* v. *Hennessy*, 42 Mont. 535, 113 Pac. 751; *St. Onge* v. *Blakely*, 76 Mont. 1, 245 Pac. 532; *Connolly* v. *Harrel*, 102 Mont. 295, 57 Pac. (2d) 781.)

In *Geary* v. *Harper*, supra, it was said: "This court is committed to the doctrine that a settler upon public lands of the United States may convey his right therein, with water rights thereto appurtenant, orally and with or without consideration, to one who thereupon takes immediate possession thereof."

There are textwriters who lay down the rule that a water right taken out to irrigate public lands is not appurtenant to such lands except where and until the appropriator brings the land to patent, but lapses with the sale or release of the squatter's right, but the rule is to the contrary in this jurisdiction. (*Geary* v. *Harper*, supra; see, also, *Wills* v. *Morris*, 100 Mont. 514, 50 Pac. (2d) 862; *McDonald* v. *Lannen*, 19 Mont. 78, 47 Pac. 648.)

(B) It appears to us that the four statutory presumptions set out above and depended upon by the trial court were ample under the circumstances here to meet every plausible contention of the defendant. Subdivision 8 of section 10606, Revised Codes, one of the presumptions relied upon, when applied to the facts and circumstances relative to Dixon delivering possession of the squatter's right to Magee, logically covered the water right. When Dixon left the place he and Magee had occupied together, he in effect delivered to Magee all of his interest in all of the property he left behind. (See *St. Onge* v. *Blakely*, supra.) This view is founded on the fact that he never

returned to reclaim anything, nor did any successor or heir ever appear to contest Magee's right to the water. It is our opinion that this presumption is sufficient to sustain plaintiffs' title along with others that we will presently mention to cure the alleged break in the chain of title running from Grant, the original appropriator, to the plaintiffs.

Subdivisions 11 and 12 of the same section reinforce the presumption under subdivision 8, and the three taken together being further supported by the long term of years the water right was exercised in connection with the land described in the complaint appears to us to be as conclusive of title as circumstantial evidence could make it.

(C) Furthermore, the last clause of subdivision 12 adds weight from another source—that is, from common reputation of ownership. The clear preponderance of the evidence is to the effect that the first water right out of the creek has been recognized as appurtenant to the lands now owned by the plaintiffs for a long period of years and was not questioned until about the time or shortly after the date that Lyle Magee sold the land to the plaintiffs. Subdivision No. 27 reinforces this conclusion. The acts of ownership exercised over the water right by Magee and his successors in interest and the uninterrupted enjoyment of such right brings the Magee ownership clearly within the presumption that a person is the owner of property from exercising acts of ownership over it or from common reputation of his ownership. That the plaintiffs acquired all the title that Magee had is not questioned. It is our opinion that if that rule does not apply here, then right by prescription could not under any circumstances be established.

The case of *St. Onge* v. *Blakely,* supra, is particularly applicable here on the point that neither Dixon nor anyone representing him ever returned to challenge Magee's claim to the water right. In that case one Davis entered into a contract with St. Onge to sell the latter certain land along with a water right and other personal property. After certain payments had been made on the contract, it was discovered that Davis had no title to the land and the purchaser refused to make further payments

but retained all the personal property that was covered by the contract and of which he had taken possession. Later St. Onge's title to the water was contested on the ground that the water right he had purchased by parol from Davis was not appurtenant to the land upon which St. Onge subsequently filed and brought to patent. The court in that case said:

"While the title to the lands was never conveyed to plaintiff F. L. St. Onge, St. Onge, by virtue of the contract with Davis and the payment of a portion of the consideration, and the continued possession, taken under the conditional sale, acquired a right to all of the property so sold to him by Davis, including the Suprenant and Marceau water right and ditches, * * * which the court finds constitute privity of title with Davis, which was good and subsisting as against all the world, excepting only Davis himself and his successors in interest, and Davis, not having taken steps to declare a forfeiture of the contract of purchase, created the presumption that he waived it."

" * * * The contract was personal between Davis and St. Onge, and when neither Davis nor his personal representatives sought to enforce a forfeiture, no mere stranger to the contract can now raise the question; paraphrasing the language employed in *McDonald* v. *Lannen,* 19 Mont. 78, 47 Pac. 648: If they did not care to take advantage of the forfeiture no one else can plead it for them.

"But, counsel assert, St. Onge received no deed for the water right. They are correct in their statement; but that fact does not affect the St. Onge right—no deed was necessary, for one who has settled upon and is in possession of public lands of the United States may convey his right in the same, together with a water right appurtenant thereto, orally and for or without consideration, to one who takes possession thereof. (*Middle Creek Ditch Co.* v. *Henry,* 15 Mont. 558, 39 Pac. 1054; *McDonald* v. *Lannen,* above; *Wood* v. *Lowney,* 20 Mont. 273, 50 Pac. 794; *Featherman* v. *Hennessy,* 42 Mont. 535, 113 Pac. 751.)"

That part of the foregoing citation where it says that the ▮ contract was personal between Davis and St. Onge and when neither Davis nor his personal representatives sought to

enforce a forfeiture, no mere stranger to the contract could raise the question, applies with particular force here. When Dixon and none of his representatives ever raised the question or returned to reclaim the water right that he had purchased with his squatter's claim from Heide, no one else was in a position to contest Magee's claim thereto.

(D) On the question of prescriptive right, as applied in favor of the plaintiff's title, it is our opinion that Magee's undisturbed possession for a period of time in excess of the time necessary to acquire title by prescription, standing alone, was sufficient to vest clear title in him. Sections 6817 and 6818, Revised Codes, respectively provide:

"6817. Occupancy for any period confers a title sufficient against all except the state and those who have title by prescription, accession, transfer, will, or succession."

"6818. Occupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar an action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all." A water right is property. (*Osnes Livestock Co.* v. *Warren,* 103 Mont. 284, 62 Pac. (2d) 206; *Murray* v. *Tingley,* 20 Mont. 260, 50 Pac. 723.)

The only vital question that seriously affects plaintiffs' title to the prior right initiated by Grant to the waters of Grove Creek is the break in the record title heretofore mentioned when Dixon released possession to Magee. The right gained by Magee by his occupancy of the right to the use of the water in accordance with section 6817 cannot be successfully challenged after so long a time, and we can disregard any question as to whether Magee acquired the Dixon right grounded on the Grant appropriation and still, within all recognized rules of law and equity, hold that Magee, upon his taking possession of the Dixon squatter's claim on Dixon's departure on or about 1900, using the water at all times without let or hindrance as shown by the record, and bringing the land on which the water was used to patent, established a first right to the waters of Grove Creek against all others.

The clear preponderance of the evidence is to the effect that no one questioned the exercise of the first right to the waters of

the creek by any owner or occupant of the land described in the complaint from and after Grant made the appropriation in 1892, until the defendant invaded the right of the plaintiffs in 1937, which resulted in this lawsuit.

Title to a water right may be acquired by prescription. (*Custer Con. Mines Co.* v. *City of Helena*, 52 Mont. 35, 156 Pac. 1090; *Verwolf* v. *Low Line Irr. Co.*, 70 Mont. 570, 227 Pac. 68; *Irion* v. *Hyde*, 107 Mont. 84, 81 Pac. (2d) 353; 20 Am. Jur., sec. 236, p. 231.)

The fact that no one interested in the Severin right attacked the Magee right for so long a period is significant. While Severin himself lived on his place adjoining the Magee place, there were four transfers of the land and water right and one lawsuit relative to the waters contested. It appears reasonable to assume that when the court in the Heide-Carstens litigation entered a decree to the effect that Heide was entitled to 120 inches as a first right out of Grove Creek, such actions affecting the water right of the little stream would have been brought home to Severin, who all this time occupied his adjoining farm.

Relative to defendant's claim of title by prescription grounded on adverse possession, his adverse claim must have been brought home to all upon whose rights his claim infringed. (*Irion* v. *Hyde*, supra, and cases cited.) One who never told anyone of his adverse claim to another's right must show possession of such a character as to give the owner notice of his hostile claim. (*Collins* v. *Thode*, 54 Mont. 405, 170 Pac. 940; *Blackfoot Land Dev. Co.* v. *Burks*, 60 Mont. 544, 199 Pac. 685; *Ferguson* v. *Standley*, 89 Mont. 489, 300 Pac. 245.) Plaintiffs' right was at rest from its inception in 1892 until 1937.

(E) There is ample evidence in the record that the defendant and his predecessors in interest have used the water involved from time to time, but no evidence tending to show that such use was open, notorious, hostile and adverse to the rights of the plaintiffs or their predecessors. (*Irion* v. *Hyde*, supra.) Use may be open and notorious and still not be adverse. (*Northern Pac. Ry. Co.* v. *Cash*, 67 Mont. 585, 216 Pac. 782.) It is a fundamental principle of water right law that a prior right may be exercised only to the extent of the necessities of the owner

of such prior right and when devoted to a beneficial purpose within the limits of the right. When the one holding the prior right does not need the water, such prior right is temporarily suspended and the next right or rights in the order of priority may use the water until such time as the prior appropriator's needs justify his demanding that the junior appropriator or appropriators give way to his superior claim. We have no substantial evidence here to show that Severin or any of his successors in interest ever complained of the use by plaintiffs' successors of the prior use of the waters involved, until this litigation arose. The court's finding that defendant's use was not adverse and that he acquired no prescriptive right is supported by a preponderance of the evidence.

2. In support of defendant's second point of law it is contended that the decree in the Heide-Carstens litigation fixed Heide's water right as having been initiated March 8, 1895; that plaintiffs predicated their pleading of first right upon the adjudication in favor of Heide in that action and should not be heard in any attempt to fix an earlier date of initiation, and to further strengthen this contention it is shown and argued that when Lyle Magee transferred the land and water right to the plaintiffs, he referred to the water right in the instrument of conveyance as fixed by that decree, and that plaintiffs are bound by the specific title pleaded. This contention of the defendant is inconsistent with his point of law number 4, where it is contended that plaintiffs showed no greater amount of water put to a beneficial use than forty-five inches. If plaintiffs were bound here by the Heide-Carstens decree, then they would be entitled to 120 inches of the water, instead of the 80 inches allowed by the court and the 45 contended for by the defendant. But we do not interpret the pleading in the complaint as contended for by defendant. Reference to the Heide-Carstens decree appears to have been used more for descriptive purposes than as the foundation of title; and it further appears from all the circumstances that all the court intended by fixing the date of Heide's water right as of March 8, 1895, was to fix a date showing its priority over the right claimed by Carstens.

The date fixed was the date of the instrument of conveyance of the squatter's right from Lind to Heide. And it rather clearly appears that the court merely set that date as the time Heide's right arose, and that being sufficient to determine the matter in his favor as opposed to the contention of Carstens, the date of initiation was not investigated further, and we are of the opinion that that decree could not be pleaded as *res judicata* between the parties here, no one but the two litigants involved there being interested in that action. The decree in that case might well be used as some evidence relating to the water right here in controversy, but is not conclusive. (See *Wills* v. *Morris,* supra.)

After describing the land, the deed from Lyle Magee to the plaintiffs contains this recital: "Together with all water rights * * * appurtenant to said premises or used in connection therewith," including the following: "All rights to the waters of Grove Creek decreed to John Heide and appurtenant to the above lands." So it becomes quite obvious that reference to the Heide decree was used for the purposes of identification along with the general clause referring to the water appurtenant to the land. This conclusion is in harmony with our ruling in *Wills* v. *Morris,* supra, where, quoting from a former decision, it was said: "A water right, as we have noted supra, is property, and a judgment which in some measure determines or affects one's water right is admissible as against a stranger, not to conclude him, but to evidence the right of one in whose favor it is rendered, and on the trial of a cause it is to be considered by the court, together with the other evidence received touching the right in question."

The point of law No. 3 is to the effect that Henry Grant made ▆▆▆ no valid appropriation prior to October 21, 1892. Plaintiffs' Exhibits "G" and "H," Grant's notices of location of water right, were dated and acknowledged October 31, 1892, recorded November 2 following and recite on the face thereof that the appropriations were made as of October 20, 1892. The recordation of the notice and the date on which the appropriation was alleged to have been made was one day prior in each

instance to the date shown by the Severin notice. The presumption is that this record is genuine (subd. 34, sec. 10606, Rev. Codes), and its contents are prima facie evidence of the facts therein stated. Grant testified that Severin's cabin was on the creek when he, Grant, located on his squatter's claim, but that his appropriation and ditch were made before Severin's, and that after he had built his ditch he helped "Joe" take out his ditch, which consisted of two plow furrows for the purpose of irrigating his garden. This is the most convincing evidence in the record as to which appropriation was first as between Grant and Severin, and we are of the opinion that defendant's contentions on this point are without merit.

But, defendant contends, Grant's appropriation was made prior to the time the Indian lands were opened for settlement, and, being initiated in trespass, was null and void. The Crow Indian treaty of 1868, 15 Stat. 649, section 2118 of the Revised Statutes of the United States, 25 U. S. C. A., sec. 180, and the President's proclamation are cited to support such contention. The treaty contains a provision to the effect that white men shall be excluded from Indian lands; but we think it is obvious that the meaning of this provision was that whites were excluded from any beneficial interest in such lands and might be excluded from physical presence on such lands if their presence thereon or their acts were inimical to Indian welfare, or if they were on the Indian lands without the consent of the tribe. We do not believe that there was any intention to provide in the treaty that travel over or across the reservation would be prohibited unless travelers were objectionable to the Indians or the particular person or persons were interfering with Indian rights. This conclusion is based upon the following facts: Title 25 of the Revised Codes of the United States Annotated, contains Chapter 5 relating to "Protection of Indians," and sections 179 and 180 are a part of that Chapter. These two sections are sections 2117 and 2118 of the Revised Statutes of the United States and provide as follows:

Section 179 (2117): "Every person who drives or otherwise conveys any stock of horses, mules, or cattle, to range and feed on any land belonging to any Indian or Indian tribe, without

the consent of such tribe, is liable to a penalty of $1 for each animal of such stock. * * * ''

Section 180 (2118): ''Every person who makes a settlement on any lands belonging, secured, or granted by treaty with the United States to any Indian tribe, or surveys or attempts to survey such lands, or to designate any of the boundaries by marking trees, or otherwise, is liable to a penalty of $1,000. The President may, moreover, take such measures and employ such military force as he may judge necessary to remove any such person from the lands.''

All reported cases that have been litigated relating to trespass on Indian lands appear to have been grounded on one or the other of these two sections. In section 179 one guilty of any of the trespasses mentioned becomes liable to the penalty therein provided if he invaded the Indian lands *without the Indians' consent.* If one did any of the things mentioned in the section with the consent of the Indians to whom the lands belonged, he would not, of course, be liable for trespass. It was held in *Kirby* v. *United States, etc.,* (9 Cir.) 273 Fed. 391, that cattle grazed on the Crow Indian Reservation in excess of the number covered by contract was not an unlawful invasion of Indian lands when the excess number were on the reservation with the consent of the tribe.

In the case of *United States* v. *Ash Sheep Co.,* (9 Cir.) 250 Fed. 592, 594, the defendant was charged with trespassing on Indian lands; crossing such lands and grazing thereon while in transit to leased lands on the Crow Indian Reservation was admitted but defended on the ground of necessity, and that access to the leased lands was not otherwise available. In the court's opinion it was said: ''It was the manifest intention of Congress to prevent the use of Indian lands by white people as pasture grounds for their stock without the consent of the Indians. * * * The purpose was to protect the pasture lands of the Indians.'' In another action under the same title, reported in 9 Cir., 254 Fed. 59, the defendant sought reversal of the judgment assessing damages in the sum of $5,000, under section 2117. In the last action the court said the penalty was

applied for the reason that defendant, "without the consent of the Crow Tribe of Indians, or of the United States, drove, ranged, and fed 5,000 head of sheep on the lands specified in the complaint." On appeal to the Supreme Court of the United States, 252 U. S. 159, 40 Sup. Ct. 241, 64 L. Ed. 507, where the two cases were affirmed, that court, like the circuit court, referred to the fact that the sheep were on the Indian lands without the permission of the Crow tribe of Indians. It thus becomes clear that the sections of the United States statutes quoted above are intended to protect Indian lands against harmful trespass, and we find no case, and none has been cited, wherein mere trespass was the basis of any action by the federal government in which penalties were imposed or expulsion of whites from Indian lands was sought. The two sections of the statute are directory in form and not mandatory. Whether any action be taken or not appears to be at the discretion of those upon whom the duty is imposed to protect Indian rights from invasion.

The case of *Langford* v. *Monteith,* 1 Idaho, 612, which defendant contends "is exactly in point," does not apply here. In that case the plaintiff began the action as landlord against the defendant, as his tenant, for holding over lands within the Nez Perce Indian Reservation, contrary to the terms of the lease previously entered into between the parties. The court, proceeding under section 180 (2118), held that the plaintiff was a trespasser on Indian lands and "without any right whatever to enter into contracts for the use and occupation of Indian land reserved under treaty." The facts and questions involved in the two cases are materially different.

There are a number of reasons which we think strongly tend ▉ to rebut the contention that Grant was a trespasser, but in our opinion the following is conclusive: The proclamation of the President recites that clause 13 of the agreement between the Indians and the United States of December 8, 1890, contained a condition that it should not be binding upon either party until ratified by the Congress of the United States, and when so ratified the lands should not be opened to settlement until boundary lines were surveyed and marked. The proclama-

tion further recites that the agreement was ratified by Act of Congress March 3, 1891, 26 Stat. 1095. It appears to us that that is the date the agreement became binding upon both parties according to its terms, and from that date to the date of the proclamation the land upon which Grant located was public domain of the United States, subject to squatters' rights of location. The provision that the lands should not be thrown open to settlement until surveyed and marked has no bearing upon the binding effect of the agreement as of March 3, 1891. Obviously, the survey and fixing boundary corners and lines was for the purpose of avoiding confusion by settlers filing on Indian lands lying along the border line between the lands ceded and the Indian reservation.

We deem it unnecessary to give any particular attention to the contention advanced under point of law number 4, for the reason that the jury and the court have found the facts to be contrary to defendant's contentions, and, under the established rule, we are not permitted to override the conclusions of the triers of the facts where, as here, the evidence does not preponderate against them.

Brennan, a tenant on the Magee place under Price as administrator for fourteen years, and two other witnesses separately holding leases on the place under Lyle Magee after he became of age, were permitted to testify for the defendant, over objections, such testimony tending to impeach the title of the landlord. The objections should have been sustained under the rule mentioned in 35 Corpus Juris, section 565, page 1224. To disregard the rule in such circumstances as are here involved would open the door for the reception of testimony arising from collusion between an unscrupulous tenant and a designing person who coveted property of the landlord, and might lead to serious mischief. The testimony of these witnesses, while of no great material value, has been disregarded.

5. Defendant's contention on the question of costs is in accord with the holdings of this court in water right actions where neither party recovers all that he claims. (See *Wills* v. *Morris,* supra, and *Osnes Livestock Co.* v. *Warren,* supra.)

Neither party recovered all he claimed in the action at bar, and defendant's contention will be sustained in the matter of costs.

The cause is remanded to the district court with instruction to modify the decree to provide that each party pay his own costs, both in the district court and here, and as so modified the judgment appealed from will stand affirmed.

MR. CHIEF JUSTICE JOHNSON and MR. JUSTICE ARNOLD, concur.

ASSOCIATE JUSTICES ANGSTMAN and ERICKSON:

We concur in the result in the foregoing opinion but not with all that is said in it.