# IRION ET AL., APPELLANTS, v. HYDE ET AL., RESPONDENTS.

(No. 7,796.)

(Submitted May 16, 1938.   Decided June 9, 1938.)

[81 Pac. (2d) 353.]

Mr. *Jerome Parks* and Mr. *W. B. Leavitt,* for Appellants, sub-
mitted a brief; Mr. *Leavitt* argued the cause orally.

*Mr. L. J. Onstad,* for Respondents, submitted a brief and argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

Ed Irion and Jennie M. Irion, as plaintiffs, instituted an action for injunction in the district court of Powder River

county against James W. and Georgie C. Hyde. The Hydes prevailed in the district court, and the Irions have appealed to this court. The question for decision involves the adjudication of a water right by adverse user against a previously initiated right.

About October 20, 1909, the plaintiffs located a ranch and appropriated water from Sheep Creek. They constructed ditches and dikes and began to use the water for irrigating purposes. Sheep Creek is what is known as a "dry creek," i. e., there is no constant flow of water in it. It carries water only after a heavy rainfall or when heavy falls of snow are melting. Plaintiffs' lands are low and flat, and their custom was to put small dams and dikes in the creek channel and flood the low lands. They did not irrigate constantly, as irrigation is ordinarily done. One of the witnesses for plaintiffs testified that if they got their lands "soaked up" once in two years, that would do pretty well and they got good crops. They had about 100 acres of alfalfa, and some small grains which were irrigated in that way. Plaintiffs' notice of appropriation called for 1,000 inches.

In 1914 defendants made and filed appropriations for 500 inches of water from Sheep Creek, and 500 inches from each of its tributaries—North Prong and Jimmie Creeks. Plaintiffs' lands were farther down and lower on Sheep Creek than those of defendants, and the creek ran through some of defendants' lands before it reached those of plaintiffs. Defendants decided to build dams on the creeks in order to hold back the waters that came during high water seasons. In order to do that it was necessary to construct dams on their own lands, but the construction thereof would of necessity hold back some of the water which plaintiffs had been using, and for which they had the prior right.

In 1914 defendants approached plaintiffs and explained to them what they desired to do and asked permission to construct a dam on Sheep Creek in such a way as to hold back and store part of the water of the creeks. They had apparently previously constructed dams on the two tributaries without asking

permission from plaintiffs. Plaintiffs granted the permission requested, but the controversial question here is as to the amount of the flow which plaintiffs permitted defendants to use by the maintenance and use of their dam.

It appears that the waters were used more or less concurrently by the parties from about 1914 until the dry era, beginning about 1934. When this suit was instituted, plaintiffs sought to have the dams removed and defendants enjoined from inter-ference with their right. Defendants answered by denying in-terference with any right of plaintiffs and by setting up an adverse right. They alleged that they had established a su-perior right to that of plaintiffs by adverse user. The cause was tried by the court and findings of fact were made in favor of defendants. The court found as a matter of fact that both parties owned their respective lands and that all lands required irrigation; however in the findings the court took the position, and found, that while there was some kind of consent given for the construction of the dam, such consent had been repudiated by the subsequent manner of user by defendants. The court then decreed that plaintiffs were entitled to no right or relief at all as against defendants.

It is settled law in this state that the burden of proving ad-verse user of water rests upon the party alleging it. (*Boehler* v. *Boyer,* 72 Mont. 472, 234 Pac. 1086; *St. Onge* v. *Blakely,* 76 Mont. 1, 245 Pac. 532.) It is equally well settled that in order to acquire a water right by adverse user or pre-scription, it is essential that the proof must show that the use has been (a) continuous for the statutory period which in this state is ten years (sec. 9024, Rev. Codes); (b) exclusive (unin-terrupted, peaceable); (c) open (notorious); (d) under claim of right (color of title); (e) hostile and an invasion of an-other's rights which he has a chance to prevent. (1 Wiel's Water Rights in the Western States, 3d ed., sec. 582, p. 628; 2 Kinney on Irrigation and Water Rights, 2d ed., sec. 1048, p. 1875; *Verwolf* v. *Low Line Irr. Co.,* 70 Mont. 570, 227 Pac. 68; *Smith* v. *Duff,* 39 Mont. 374, 102 Pac. 981, 133 Am. St. Rep. .582.) All of the foregoing elements must exist before a court

is justified in declaring a superior right by adverse user or prescription, and no one element may be omitted without being fatal in the proof of adverse user. The trial court made certain observations in connection with its findings in which it recognized these essential requirements. It observed also, and we agree, that if the use were a permissive one, no matter how long continued, it could never ripen into an adverse or prescriptive right. (1 Wiel's Water Rights, 3d ed., sec. 587, p. 634; 2 Kinney on Irrigation and Water Rights, 2d ed., sec. 1050, p. 1880.)

The court found, in the last analysis, that the burden of proving adverse user had been met by defendants, and, specifically, that no such permission was granted to defendants by plaintiffs as would negative in any manner the adverse character of the defendants' use. In the light of its findings it must have believed that the use was hostile, and that there was not enough water for both parties except in times of extreme flood, and, also that the use was without the permission of plaintiffs.

In view of our decision it will not be necessary to rehearse the evidence at length to demonstrate whether the various essentials for adverse use have been met, as the trial court found, because as stated before, the failure of proof as to any one element is sufficient to defeat such claim.

The trial court has favored us with an unusually comprehensive set of findings and observations, from which it is very plain to see upon what theory its decision was based. The following quotation therefrom concisely states its position: ''If the plaintiffs gave the defendants permission to use only *some of the overflow waters* on Sheep Creek, then that permission was repudiated by the fact that the defendants used *all of the* waters on Sheep Creek and its tributaries to the exclusion of the plaintiffs, and the plaintiffs having had actual knowledge of such fact and having had need for said waters during all of the time since 1915, a period of nearly twenty years, I am forced to hold that the defendants have gained a superior right to the waters of said creek by adverse user.''

We are unable to agree with the theory adopted by the trial ▮ court. In the first place, it must be remembered that the creek in question, as before pointed out, is not one in which a normal flow of water is maintained. It is normal only in so far as the periodic rains and runoffs from the watershed can make it, but not such a stream as lends itself readily to a dependable appropriation and ordinary irrigation. With this type of creek existing upon the lands of both plaintiffs and defendants, the latter came to plaintiffs and asked their permission to build a dam in the main channel of the creek on defendants' land, to spread out waters on that land. The trial court apparently held that the permission given was for defendants to construct dams and store overflow flood waters as distinct from the normal flow flood waters, and that, because defendants had not only stored the overflow flood waters and used them but took all of the waters that came down the stream, defendants took the normal flow waters without consent and thereby established an adverse right as against plaintiffs.

There is no question by either side but what permission of some sort was requested and given, but the disputed point, as before noted, is as to the extent of that permission. Obviously, defendants did not have to ask anyone's permission to build a dam in a creek upon their own land so long as they did not interfere with the prior rights of others. Whatever water was there was theirs to appropriate in any amount they could use beneficially, if such amount had not already been appropriated to a beneficial use by others. The request for permission to build the dam must, therefore, have been made in order to obtain some concession from the plaintiffs who had the prior right on the creek, and who would be the ones to suffer from any interference with the flow thereof, authorized or otherwise. If they chose to suffer the use of their water right by others, such was their privilege, and that such use might occur at times when they themselves might have need for the water would be of no moment, unless they had made request for the water and were refused. Certainly, they should not be penalized for their generosity.

This being a permissive use, and in the nature of a gift, any idea of abandonment is immediately negatived. The necessary concurrence of act and intent to abandon is lacking, and there was no relinquishment of a right. As was aptly quoted in *Middle Creek Ditch Co.* v. *Henry,* 15 Mont. 558, 577, 39 Pac. 1054, 1058: ''Abandonment must be made by the owner, without being pressed by any duty, necessity, or utility to himself, but simply because he desires no longer to possess the thing, and, further, it must be made without any desire that any other person shall acquire the same; for, if it were made for a consideration, it would be a sale or barter, and if without consideration, but with an intention that some other person should become the possessor, it would be a gift.'' (See, also, *Blackfoot Land Development Co.* v. *Burks,* 60 Mont. 544, 199 Pac. 685; *St. Onge* v. *Blakely,* supra; *Osnes Livestock Co.* v. *Warren,* 103 Mont. 284, 62 Pac. (2d) 206; *Featherman* v. *Hennessy,* 42 Mont. 535, 113 Pac. 751.)

Concededly, there is a distinction between the so-called overflow of a stream and the normal flow. Even a creek like Sheep Creek would be capable of having an overflow. The lower court relied upon this distinction in arriving at its decision, its theory being, to repeat, that when defendants began using all of the waters in the creek and not limiting themselves merely to the overflow, they repudiated any understanding had or permission given them by plaintiffs as to the use they were to make, and from then on their use became adverse to plaintiffs after a continuation of such conduct openly, notoriously, etc., for the statutory period.

A careful study of the record, in our opinion, fails to bear out the theory of the trial court. It seems plain to us from the testimony of both plaintiffs and defendants that the permission given was to hold back whatever waters might come down the creek—overflow waters or otherwise—because they believed when there was water for one there would be water for both. This flood water was the type of water used by plaintiffs before defendants attempted to initiate a right. The only difference in the use of the water by the parties was that plaintiffs

did their irrigating directly from the creek at these periods, whereas defendants sought to hold back and store some of the waters during the flood periods for use at a later time.

The important, and we think decisive, factor in the matter of permission has to do with the fact that permissive use ordinarily negatives any idea or possibility of adverse use. It naturally follows that if a party contemplates interfering with the established right of another by the construction and use of a dam irrespective of consequences, there would be no reason or necessity for asking for any consent or permission to build at all.

If defendants' construction of the dam and the subsequent use of the waters by means thereof was by permission of plaintiffs and contemplated the holding back and the storage of certain waters to which plaintiffs were entitled by reason of their prior appropriation, then such use could not in any manner ripen into or establish a superior right as against plaintiffs by adverse user without some change of condition, that is, without notice of some definite character.

The question of the permission is determinative of the manner of use. The record does not disclose that there ever was at any time subsequent to the permission, any notice on the part of defendants to plaintiffs that the permission was repudiated and that defendants were establishing a right antagonistic and adverse to plaintiffs. The whole thing proceeds entirely upon the original agreement, and the further fact that defendants by reason of their superior position upon the creek and the maintenance of the dams, were in position to get the first water and that at times during the years after the dams were built, they took water and used it when plaintiffs had use therefor. However, the record does not disclose that plaintiffs ever demanded water that was being used by defendants, until the year 1934. In our opinion, the record clearly discloses that the status of the parties as established in 1914 never legally changed until 1934.

Plaintiff, Ed Irion, testified that he told defendants to go ahead and put the dam in and that there would be water enough

for both of them. The principal defendant, the elder Hyde, testified: "I asked his permission to dam the creek and he told me to go ahead." On being further questioned by the court he testified: "He said, 'go ahead and build your dam whenever there is water for one of us there would be water for both of us.' " True, the record does contain evidence which would indicate that plaintiffs did not get all the water they needed every year, or which they could have beneficially used had not defendants' dams held it up; nevertheless the fact remains that plaintiffs did grow and mature their crops apparently until 1934, the year they complained to defendants in the matter of the dams. No evidence was offered showing that plaintiffs' crops ever suffered by reason of the failure to get water for irrigation while defendants were using or withholding such water, other than that plaintiffs needed and could have used more. Therefore, we are of the opinion that the evidence of the use of the water by defendants fails to show that plaintiffs were ever substantially deprived of the benefit thereof without their consent, from 1914 to 1934.

We do not hold that it was absolutely necessary that defendants should have served actual notice upon plaintiffs that they were taking the water adversely and against their rights, but it was necessary that defendants' use be adverse and hostile to the right of plaintiffs. While some of the considerations that involve adverse possession of real estate are applicable to water rights, yet there is a distinction as pointed out in the case of *St. Onge* v. *Blakely,* supra. In that case the court called attention to the distinction and said: "While in each instance the right is established by proof of hostile possession of another's property, with proof of other attendant circumstances, the hostile possession of lands may be shown by proof of 'such acts of ownership and occupancy as are sufficient to "hoist his flag" over the lands, so that all may observe it' (*Collins* v. *Thode,* 54 Mont. 405, 170 Pac. 940), and such exclusive possession of necessity ousts the true owner from the land; two parties may at the same time be in possession of water from a creek and neither hold adversely to the other; each may justly claim the right to

use the water he is using, without affecting the rights of the other, and therefore, in order to constitute adverse possession of water, the burden is upon the claimant to show that his use of the water deprived the prior appropriators of water at times when such prior appropriators actually needed the water; the use does not become adverse until it interferes with the use thereof by the prior appropriators, and therefore proof merely that the claimant used water and claimed the right to use it is no proof whatever of adverse use.''

The rule adhered to in this state is that, ''No adverse user ▮ can be initiated until the owners of the superior right are deprived of the benefit of its use in such a substantial manner as to notify them that their rights are being invaded.'' (*Boehler* v. *Boyer,* supra.) The natural and necessary corollary to that rule is that, ''Proof of the mere use of the water during the statutory period is not sufficient. It is necessary that during the entire period an action could have been maintained against the party claiming the water by adverse user by the party against whom the claim is made.'' (*Smith* v. *Duff,* supra; *Boehler* v. *Boyer,* supra; 1 Wiel's Water Rights in the Western States, 3d ed., sec. 589, p. 638; 2 Kinney on Irrigation and Water Rights, 2d ed., sec. 1050, p. 1882.)

In the case of *Smith* v. *Duff,* supra, the following was said, and we think it appropriate here: ''Because of the nature of the right, the elements constituting it must be proven satisfactorily and unequivocally; and no doubtful inference will suffice. The right by adverse user, or prescription, is acquired, in some measure, by an invasion of the rights of others—it bears a sort of kinship, by refined descent, to the 'possession by bow and spear' of an earlier time; it is based upon a positive assertion of right in and by the water user in derogation of the rights of every one else. In order to constitute an ownership by adverse user, say the authorities, the use must have been open, notorious, continuous, adverse, and exclusive under a claim of right, for the statutory period, which in this state is now ten years.'' (See, also, *Osnes Livestock Co.* v. *Warren,* supra.)

Tested in the light of these principles and what we have said, we do not believe that plaintiffs could successfully have maintained an action against defendants for their interference with the flow of the creek, at least, not in the absence of evidence showing that the permission given had subsequently been revoked. The permission granted by plaintiffs, under our theory of the evidence, would have been a good defense to any such action.

In the memorandum opinion filed by the district court, a quotation was made from 67 C. J., page 946, section 400, and some reliance was apparently placed upon the statement therein contained, to the effect that even though a use may be by permission in the first instance, yet if thereafter it is exercised under a claim of right for the period of prescription, its original character does not prevent the acquisition of a prescriptive right thereto, etc. We agree that this statement of abstract law is correct, but, under our view of the evidence and the unlimited and unqualified permission given, it can hardly be held to have application here. It is to be noted, however, in that connection, that in the same section there appears the following: "Unity of possession during the period when the use occurs and the prescription is claimed to have arisen, prevents prescription."

A careful scrutiny of the record in this case leads to the conclusion that during many of the years following the construction of the dam, there was use of the water of Sheep Creek by both appropriators, and while there may have been years when plaintiffs did not get any water, nevertheless the record shows that they did not always require water every year, and there is nothing in the record to disclose that defendants' use was in any wise hostile or in derogation of the right of plaintiffs. The conditions prevailing on the creek were typical of those existing on many of the creeks in this state.

We conclude, therefore, that the court was in error in holding that the right of the plaintiffs was abandoned or lost to the defendants because of adverse user.

The rights of the parties were not to be measured entirely by what they claimed in their appropriation notices. They

were to be measured and gauged by their beneficial use over a reasonable period of time after they initiated the appropriations. In establishing the prior right of the plaintiffs consideration must be given to the extent and manner of their use, the character of their land, and the general necessities of the case. ''To the extent of his appropriation his supply will be measured by the waters naturally flowing in the stream and its tributaries above the head of his ditch, whether those waters be furnished by the usual rains or snows, by extraordinary rain or snowfall, or by springs or seepage which directly contribute.'' (*Beaverhead Canal Co.* v. *Dillon etc. Co.*, 34 Mont. 135, 85 Pac. 880, 882.) It does not follow that plaintiffs were entitled to 1,000 inches because they designated that amount in their appropriation. Neither does it follow that defendants were of necessity entitled to the full amounts designated in their appropriation notices. All of these matters were subject to proof of use. (See *Bailey* v. *Tintinger*, 45 Mont. 154, 122 Pac. 575; *Peck* v. *Simon*, 101 Mont. 12, 52 Pac. (2d) 164.)

While the action was really not instituted as a suit for the complete adjudication of all the rights of the parties, nevertheless we think the pleadings are sufficient to justify such an adjudication as between the parties to this action. We do not believe, however, that plaintiffs are entitled to an injunction as sweeping as that demanded. The complaint demands the destruction or removal of the dams. To us that does not seem justified in the light of the present-day theories, of which we may take judicial notice. It is a matter of common knowledge, and may be ascertained from both federal and state statutes, that water conservation and the construction and maintenance of dams and reservoirs is an important and recognized plan of both government and state. In view of that fact we think the court would be exceeding the necessities of this case were it to require the destruction of the dams. We see no reason why the exigencies of the situation may not be reached and the rights of the parties protected by the installation of headgates. In fact, the court evidently understood the matter, because at one period of the trial the court asked one of the plain-

tiffs if the installation of headgates would not satisfy the requirements, and the answer was "Yes"; however, this is a matter for the trial court to determine.

The judgment is reversed with instructions to the district court to proceed in accordance with this opinion.

ASSOCIATE JUSTICES ANDERSON and MORRIS concur.

MR. CHIEF JUSTICE SANDS and MR. JUSTICE ANGSTMAN, being absent, the former on account of illness, did not hear the argument, and take no part in this decision.

Rehearing denied July 22, 1938.