IRION ET AL., APPELLANTS, *v.* HYDE ET AL., RESPONDENTS.

(No. 8,013.)

(Submitted March 8, 1940.   Decided July 15, 1940.)

[105 Pac. (2d) 666.]

*Mr. Jerome Parks* and *Mr. W. B. Leavitt,* for Appellants, submitted a brief; *Mr. Leavitt* argued the cause orally.

*Mr. L. J. Onstad,* for Respondents, submitted a brief and argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

This is an appeal from an amended judgment rendered pursuant to new findings of fact and conclusions of law made after the cause had been here on a prior appeal and had been remanded to the district court for further proceedings.

In 1937 plaintiffs sought to enjoin defendants from maintaining dams alleged to interfere with plaintiffs' prior water rights on Sheep Creek. In their answer and cross-complaint defendants claimed a water right superior to plaintiffs' to the extent of 1,500 miner's inches on the creek and two of its tributaries, by adverse user and by plaintiff's abandonment, and sought an adjudication of their right. Plaintiffs' reply denied the allegations of abandonment and adverse user and alleged that defendants' storage and use of the water had been initiated with plaintiffs' qualified consent, and that defendants had never claimed adversely to plaintiffs until 1934. Upon the original trial the district court rendered findings of fact, conclusions of law and decree sustaining defendants' claim to water rights superior to plaintiffs' by adverse user, and denying plaintiffs requested injunction against the maintenance of defendants' dams. On the first appeal (*Irion* v. *Hyde,* 107 Mont. 84, 81 Pac. (2d) 353) the plaintiffs' contentions were sustained in this court and the judgment awarding defendants a superior right was reversed; but as the measure of plaintiffs' prior right was not established in any way at the first trial, and as it appeared to the court that there might be some appropriate remedy for the defendants' interference with plaintiffs' right short of the destruction of defendants' dams, the cause was remanded for further proceedings. To save repetition the judgment roll incorporated in the transcript in the former appeal, Cause No. 7796, was not repeated in the transcript on this appeal, but was incorporated therein on appellants' motion.

It was shown on the trial in 1938 that Sheep Creek is a natural dry watercourse without water except during the spring run-off and after heavy rains. Plaintiffs' appropriation

is by means of a diversion dam which by raising the level in the creek bed only three or four feet caused all of the water to flood between 100 and 130 acres of plaintiffs' land through a natural swale or old channel in which plaintiffs have constructed a ditch; the uncontroverted evidence shows that plaintiffs' diversion ditch and swale carries all the water which comes down the creek except under very unusual conditions and that little gets away even in great floods; that "it did top over once" more than ten years prior to the hearing; that all of the water is required for the flood irrigation of plaintiffs' lands; that there has been surplus water at plaintiffs' point of diversion only at times of extreme floods, or when the frost was still in the ground; that only once in ten or twenty years had there been any excess water in summer floods, and not during the past ten years; that the spring run-off ordinarily takes from two to four days, but that the only flow since 1927 was the early spring run-off of 1938 when there was a small amount for two days but not sufficient for all of plaintiffs' needs, "a little flow, but not much"; that in 1935 the dam was about full and the water ready to run out on plaintiffs' lands, but that defendants were holding water back at his dam and not enough escaped to put the water on plaintiffs' land.

It was shown that the defendants formerly had two storage dams on tributaries of the creek above their own and the plaintiffs' diversion on the creek itself, but have abandoned them and their only diversion is by storage and diversion dam about three and three-quarters miles away from plaintiffs' on a direct line, but some nine miles above following the windings of the creek; that this dam is higher than the banks of the creek at that point and backs the water up about 200 yards; that it stores or diverts all the water of the creek except in very extreme floods, and has taken all water that has come down in the past ten years and longer, except that on one occasion twelve. years before the retrial and again in 1938 there has been some surplus; that there had been only a few such occasions since 1915. The bottom of the diversion ditch is about four feet below the crest of the dam and water flows through it to defendants' land when only

three or three and one-half feet deep in the reservoir, and the capacity of the reservoir is 20.1 acre-feet. There is no gate or spillway in the dam and no headgate in the ditch. The defendants claim to need and use all the water in the creek to irrigate something less than thirty acres. Defendants testified that the creek did not run at all except at time of spring flow or "gully washer," and only when practically bank full; but no witness testified to ever having seen it running bank full. One of the defendants testified that if there was water for one there was water for both, but admitted that only three times since 1914 had there been any excess water at their dam, and that except for those times they had used all of it. The evidence throughout was unsatisfactory; there was considerable ambiguity in the testimony and defendants may have meant to say that there was also occasionally some excess of water at the time of the spring run-offs in addition to the three times mentioned.

The watershed of defendants' dam is 7.2 square miles and that of plaintiffs' dam below defendants' is 8.36 square miles, but ordinarily there is a greater head of water at defendants' dam than at plaintiffs', the testimony showing that the land is flatter on plaintiffs' watershed than on defendants' and also that there are some 275 pot holes in the creek bed between plaintiffs' and defendants' dams. No competent evidence appears in the record as to the capacity of these holes, absolutely the only testimony offered being that of an electrical engineer who stated that he had taken up hydro-electric engineering and had had experience in surveying land, measuring reservoirs and computing the volume and flow of water. He testified as a witness for defendants that he had walked down the stream to a point about a mile and a half below defendants' dam, in that distance had counted 119 pot holes, and had measured four which he picked out "at random" as "appearing about of the same average." The capacity of the largest in cubic feet was 5,140 and the smallest 2,127, of all four 14,914, and of their average 3,728. He did not look at the other 156 in the other seven and one-half miles at all but assumed that the four were average, not only of the 119, but of the entire 275, and on that assumption computed their

entire capacity at 1,125,200 (he apparently meant 1,025,200) cubic feet, which he said was 149,300 cubic feet (about seventeen per cent.) more than the capacity of defendants' reservoir. Obviously no one could merely look at 119 holes in the ground and pick out four, the largest of which was two and one-half times the size of the smallest, and credibly testify that their average capacity was even approximately that of the 119; and the assumption is palpably fantastic as a basis for computing the capacity of 275 holes, 156 of which he had never even seen. Such testimony obviously constituted no evidence whatever of the contents of the pot holes.

The same is true of his evidence with reference to the maximum flow of the creek. He had never seen water flowing there, but at a point about one and a half miles below defendants' dam, the condition of which he did not describe, and which he selected. not as being typical of the creek bed in grade, cross-section and other characteristics, but merely as being "a section where I would be able to compute and measure it," he had found what he called "trash marks" indicating the high water mark of the spring of 1938, and said that from the measurements he made there he computed "the capacity or volume of water in Sheep Creek." His entire testimony on this point was as follows:

"The capacity of the creek is undoubtedly greater than I measured. The measurement I took was from the evidence there, which was a trash-line, indicating beyond doubt that the water had been that high recently enough so that the trash-line was left. The cross section taken and the water level block between the cross sections taken, gave me the figure upon which a computation of the flow at the time that trash-level was left was made. That flow computed is 7180 miners inches."

Apparently he made some effort to determine the grade at that point, although there was no testimony whatever indicating what he meant by "the water level block between the cross sections taken," or where or how far apart the cross sections were, or whether the point in question was typical or fairly representative of the channel conditions in general, or whether the high water mark represented crest of flow or merely a high storage point,

and if the former, whether such maximum crest might have continued a week or a second, or whether such flow at that point might have continued as a maximum flow at any other point on the creek, and particularly at plaintiffs' intake seven and one-half miles below. It is well known that flotsam is deposited most largely at points of eddy or slow current and by slowly falling water levels rather than by swift direct flow, so that the high water mark was at least equally susceptible to explanation as indicating a backing up of the water at that point, and therefore as an accumulation of flow over an extended period rather than as the flow at one moment of time. A temporary damming of the water, or even a permanent condition due to a flatter grade or a sharp turn just below the point measured, may easily account for the high water mark. There must certainly be some turns in a stream bed which runs about nine miles between points three and three-quarters miles apart, and there is no evidence whatever that the volume of water represented by the cross-section to high water mark at that point represented the flow at any one moment of time. But even if it did represent immediate flow, there was no evidence what the grade of the stream bed was at that point, or whether such grade and other material conditions were sufficiently continuous and representative to enable an engineer to determine the actual head of water even at that point, to say nothing of the conditions at defendants' dam seven and one-half miles below. In other words, there was no evidence whatever given on the point except opinion testimony based upon utterly inadequate premises.

It seems that the engineer who testified comes within the classification of a skilled observer rather than an expert witness. However, the rules relative to the testimony of both expert witnesses and skilled observers as to their own observations, computations and conclusions are essentially the same. They are stated generally in American Jurisprudence and Corpus Juris as follows:

"If the witness called upon to give expert testimony is acquainted with the facts of the case—that is, if he has personal knowledge or has made personal observation—he may give his

opinion upon the basis of his knowledge and observation in response to direct interrogation, provided he is shown to have sufficient knowledge of the facts to enable him to form an opinion entitled to be given weight by the jury and, according to the weight of authority, provided the witness first testifies to the facts in his own knowledge upon which his opinion is based." (20 Am. Jur. 666, sec. 793.)

"It is necessary, according to the great weight of authority, that an expert witness giving an opinion upon facts of his own knowledge or based upon his own observation first testify to the facts upon which his opinion is based." (20 Am. Jur. 666, sec. 794.)

"A skilled witness is permitted to state facts known to him because of his special knowledge and experience, or his inference from facts observed by him where the matter involved is such that persons without his special training could not observe intelligently or draw correct inferences. An expert, whose special training and experience enables him to draw a correct inference from facts outside the range of ordinary human experience, is therefore permitted to state an inference based on an assumption of the truth of facts detailed in evidence. The law does not, however, look with favor upon opinion evidence, and the practice of receiving opinions has been subject to considerable criticism." (22 C. J. 498, sec. 594.)

"A witness, of special knowledge or skill on a subject outside of the ordinary realm of human experience, may be permitted to state his inference, from facts observed by him, as to matters connected with his specialty, not only because of the frequent difficulty of communicating the facts to the jury but also because, even if the facts could be fully laid before them, they would not possess the special knowledge or training necessary to coordinate and weigh the facts so as to draw the correct and proper inference therefrom. Such a witness is frequently termed an expert, but this is inaccurate, for the skilled witness testifies to the result of his own observation, and occupies the same position as any other witness except that within certain lines he possesses a superior knowledge which enables him to understand, as one

without such special knowledge could not, what he has observed, although he may also be competent to testify as an expert upon hypothetically stated facts.'' (22 C. J. 632, sec. 728.)

''It is usually held that a skilled observer who states inferences from sensation must, like an ordinary witness, and for similar reasons, state the facts upon which his opinion is based so far as they permit of detailed enumeration. But there are also cases in which such a witness has been permitted to state his opinion without detailing the facts on which it is based, leaving these to be brought out on cross-examination, and certainly no error is committed where the witness states his conclusion first, and immediately proceeds to state the facts on which it is based.'' (22 C. J. 634, sec. 729.)

'' * * * , the judgment of an expert, when opposed to undisputed facts and the dictates of common sense, will not support a verdict, and the court should not permit the jury to be influenced by evidence on which they could not, within the laws of correct reasoning, make a finding.'' (22 C. J. 733, sec. 823.)

''It may occur that, even where the facts are correctly observed and accurately stated by the witness, they do not lead to the conclusion which he derives from them.'' (22 C. J. 727, sec. 820.)

''The reasons for rejecting a conclusion become stronger where it is apparent that it cannot reasonably be reached on the facts which are claimed to support it, where such facts are themselves the result of inference, or where the conclusion is not a necessary one.'' (22 C. J. 492, sec. 590.)

An expert witness can give an opinion based upon facts previously testified to by him (*State* v. *Megorden,* 49 Or. 259, 88 Pac. 306, 14 Ann. Cas. 130), but cannot be permitted to give an opinion or conclusion on facts known to him and not communicated to court or jury; he must, so far as possible, first detail the facts. (*State* v. *Simonis,* 39 Or. 111, 65 Pac. 595; *State* v. *McLennan,* 82 Or. 621, 162 Pac. 838; *State* v. *Willson,* 116 Or. 615, 241 Pac. 843; *Northwest States Utilities Co.* v. *Brouilette,* 51 Wyo. 132, 65 Pac. (2d) 223, 69 Pac. (2d) 623.)

In *Copenhaver* v. *Northern Pac. Ry. Co.,* 42 Mont. 453, 113 Pac. 467, this court, adopted the following language from *Dougherty* v. *Milliken,* 163 N. Y. 527, 57 N. E. 757, 79 Am. St. Rep. 608: "It may be broadly stated as a general proposition that there are two classes of cases in which expert testimony is admissible. To the one class belong those cases in which the conclusions to be drawn by the jury depend upon the existence of facts which are not common knowledge and which are peculiarly within the knowledge of men whose experience or study enables them to speak with authority upon the subject. If, in such cases, the jury with all the facts before them can form a conclusion thereon, it is their sole province to do so. In the other class we find those cases in which the conclusions to be drawn from the facts stated, as well as knowledge of the facts themselves, depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence. In such cases not only the facts, but the conclusions to which they lead, may be testified to by qualified experts. The distinction between these two kinds of testimony is apparent. In the one instance the facts are to be stated by the experts and the conclusion is to be drawn by the jury; in the other the expert states the facts and gives his conclusion in the form of an opinion which may be accepted or rejected by the jury."

With particular reference to engineers' computations it has been held that a witness who is not a hydraulic engineer may testify to certain measurements he has made of the width and depth of the stream, and the speed of the current, and of the quantity of water then flowing in the stream, from his calculations based upon the facts recounted. (*Gallatin* v. *Corning Irr. Co.,* 163 Cal. 405, 126 Pac. 864, Ann. Cas. 1914A, 74.)

The supreme court of Oregon in *Gallagher* v. *Kelliher,* 58 Or. 557, 114 Pac. 943, 115 Pac. 596, has expressed what seems to us the correct rule with regard to computations of this kind. In that case it was said: "A surveyor's opinion as to the result of the survey, unsupported by the details of the survey, both as to the data upon which it is based and the manner of reaching the result is not competent, but when he gives the details of his

work, it is a question of law whether his method was correct and a question of fact whether his result is correct.'' (Citing *Seabrook* v. *Coos Bay Ice Co.*, 49 Or. 237, 89 Pac. 417.)

Tested by these rules, it seems clear that the witness' conclusions as to the maximum flow of the stream and the volume of the pot holes constitute, as a matter of law, no evidence whatever. As to the first the evidence leading up to the computation is indefinite, incomplete and insufficient as a basis of computation and shows that the witness had never even inspected seven and one-half of the nine miles between the dams; two essential elements, proof that the place measured was typical of the stream as a whole, and that the high water at that point was the result entirely of present flow, and not partly of accumulation, are entirely lacking; the method of computation was therefore incorrect as a matter of law. As to the second, the evidence leading up to the computation shows that the witness had never even seen most of the 275 pot holes, and that the method of multiplying the average capacity of the four pot holes measured by 275 was incorrect as a matter of law. Constituting no evidence whatever upon these points, the testimony can form no basis for findings or conclusions.

Even if this were not true, the witness' computations of the flood flow of the creek as 7,180 inches and the maximum diversion through plaintiffs' ditch as 656 inches are incredible and impossible when considered together. If the estimated flow seven and one-half miles above plaintiffs' dam was eleven times the capacity of plaintiffs' ditch, and if the conditions at the two points were substantially identical, as the witness assumed, it is incredible that the plaintiffs' dam would not have been washed out at the time of the flow, whereas the evidence showed that no excess flow existed there at all. Or, if not utterly incredible and inconsistent, the presence of a great amount of water seven and a half miles upstream is obviously no proof that there is or will be surplus flow at plaintiffs' diversion, for the evidence shows there was none in this instance. Finally, in any event, it seems entirely improper to predicate upon the evidence of one admittedly unique occasion—the only such occasion in twelve years,

according to the testimony of both parties—a conclusion that "at times of melting snow or after heavy rains * * * there is more than sufficient supply of water available for both parties," even if upon that occasion some excess or escape flow had existed at plaintiffs' dam.

Largely upon that testimony it was argued by the defendants, and apparently found by the trial court, that whenever any water at all flows in the stream there is plenty of water for both parties and that in such cases the defendants' dam does plaintiffs no harm; and that on other occasions even if defendants' dam is full there is ordinarily no use of releasing the water because the pot holes will absorb all of it. The first conclusion is not supported by the evidence. If it had been, obviously defendants could have made no substantial showing of adverse user as against plaintiffs. The second is equally unsupported by the evidence and is further untenable because it must obviously depend upon four indeterminate variables, namely: (1) Whether the pot holes or part of them are already entirely or partly full; (2) how much additional water might originate in plaintiffs' watershed below defendants' dam; (3) how much additional water might be supplied by continuance of the rain or other cause of flow on either or both watersheds; and (4) how much more water than the capacity of their dam the defendants might divert upon their land through their ditch, which has no headgate. In view of these indeterminate variables, it seems obvious that no general rule can possibly be devised to determine what flow at defendants' dam would suffice to reach plaintiffs' dam in useful quantities.

It is well settled that a subsequent appropriator attempting to justify his diversion has the burden of proving that it does not injure prior appropriators. (*Donich* v. *Johnson*, 77 Mont. 229, 250 Pac. 963.) Certainly here the defendants have not sustained that burden. It is apparent that they have not proved and cannot prove that their diversion would not in any case harm the plaintiffs simply by evidence as to the amount of flow or volume of water at defendants' dam or at a point a mile and a half below it. The only possible proof of such non-inter-

ference would be evidence, (1) that in spite of defendants' diversion there is actually available at the plaintiffs' point of diversion all the water for which they then have a beneficial use up to the limit of their appropriation; or (2) that if insufficient water is available there defendants' storage or diversion of water did not contribute to that result. Not only have the defendants failed to prove non-interference with plaintiffs' prior right, but the evidence shows affirmatively that there has been such interference and that it is still continuing.

There is no question that one of the paramount needs of the semi-arid states is the conservation of water. However, it is not conserved by permitting a later appropriator utterly to destroy a prior appropriation for the irrigation of some 130 acres by an appropriation to irrigate approximately 30 acres.

We must, therefore, sustain plaintiffs' objection to that part of the trial court's finding No. III that "in flood times there is more water flowing at said [plaintiffs'] point of diversion than may be put to a beneficial use" (although there is evidence that there has sometimes been such surplus water) and that "in said creek bottom there are approximately two hundred and seventy-five pot holes or depressions which have a combined capacity much greater than any water which might be stored in the reservoir of the defendants"; also to that part of the court's finding No. IV, except as to the part in parentheses: "(That Sheep Creek is what is known as a dry creek, having no constant flow of water and it only becomes a running stream at times of melting snow or after heavy rains;) that at such times there is more than a sufficient supply of water available for the use of both parties; that at other times and under the average condition of moisture, an occasional rainfall may cause a flow of water at the premises of the defendants, which, if left to meander down the water course of Sheep Creek, would never reach the point of the plaintiffs' diversion by reason of the numerous so-called pot holes or depressions in the creek bed which would absorb and retain the meager flow of water; that at all of such times the dam and reservoir of the defendants have not constituted an

obstruction to the water of Sheep Creek so as to interfere with the prior right of the said plaintiffs.''

In its sixth finding the court found that the evidence was insufficient to determine what volume of water at the defendants' premises would be necessary to reach plaintiffs' diversion in any useful quantity. Not only is that finding true, but the facts above recited indicate that no such evidence can possibly be given, due to the four indeterminate and indeterminable variables mentioned above. We must, therefore, sustain appellants' objection to the further finding, added by the court about two months after the original findings and conclusions, to the effect that ''either party may, upon notice to the other, apply to the court for a further hearing to fix definitely what volume of water is necessary at defendants' premises to reach the point of diversion of the plaintiffs in any useful quantity.''

The evidence does disclose, however, that there may at times be conditions, such as empty pot holes, dry stream bed, and rainfall principally or entirely above defendants' dam and not long continued in character, under which it may be demonstrable that storage or diversion by defendants may not be the proximate cause of plaintiffs' failure to receive water. In such instances defendants have both the burden and the privilege of showing the facts; but it seems obvious that no general rule can be devised ''to fix definitely what volume of water is necessary at defendants' premises'' to reach plaintiffs' ditch.

The trial court's conclusion of law No. III, which is also attacked by the plaintiffs on this appeal, is as follows:

''That the defendants are entitled to put to a beneficial use any of the water flowing in said creek at their premises which, if permitted to flow, could not reach the plaintiffs' point of diversion in any useful quantity, but the defendants are hereby restrained and prohibited from using or interfering with any water of said creek which *is of sufficient volume,* if permitted to flow, to reach the plaintiffs' point of diversion, except when there is sufficient water flowing in said creek to satisfy the needs of both parties, and if at any time there is a sufficient volume of water in said creek at the defendants' premises to reach the

plaintiffs' said point of diversion in any useful quantity up to six hundred and fifty-six miner's inches, the defendants are ordered to provide some means, such as a headgate or spillway, so that such water will not be obstructed and thus prevented from reaching the premises of the plaintiffs.''

That conclusion of law is erroneous in seeming to make the ██ test the volume of flow at defendant's dam, to the exclusion of the other material conditions. The test of defendants' right is not whether the particular water at their dam would reach plaintiffs' ditch, or whether the volume there would be sufficient to convey water to plaintiffs; the test is whether under all the conditions (and not merely with reference to the volume at defendants' dam) the defendants can impound or divert water without substantially interfering with plaintiffs' rights. In order to justify their diversion, defendants must be in a position to show affirmatively that under all the conditions such diversion does not reduce or limit the plaintiffs' receipt of water to which the latter are entitled. Possibly defendants can prove that plaintiffs have received their full appropriation in spite of defendants' taking of water. Or it may be that in a particular instance defendants can show that the rainfall was sufficiently slight and the stream bed sufficiently dry that no water would reach plaintiffs whether or not the defendants impounded or diverted water at their dam; and in that event defendants' acts would not be detrimental to plaintiffs. That is the limit of the meaning attributable to the court's statement on this question in *Raymond* v. *Wimsette,* 12 Mont. 551, 31 Pac. 537, 33 Am. St. Rep. 604.

It seems to us that a final disposition of the controversy is necessitated by the fact that these flood water rights of relatively slight value have already involved two trials in the district court and two appeals to this court, and that the decision here appealed from would involve at least one further trial of facts in the district court in an obviously futile attempt to lay down a rule as to what amount flowing in the creek at defendants' dam would reach plaintiffs' point of diversion under any and all varying conditions, some of which, as recited above, must neces-

sarily be continuing or future ones and cannot possibly be ascertained at any instant of time.

The cause is, therefore, remanded to the district court with instructions to enter a final judgment in accordance herewith requiring the defendants to install a headgate at the bottom of their dam sufficient to let all water through without storage or diversion, and to impound or divert the flow of the stream only when such action will not prevent plaintiffs from receiving, or reduce their receipt of, water to which they are entitled.  Appellants shall have their costs on appeal.

Associate Justices Erickson and Arnold concur.

Mr. Justice Angstman:

I dissent.  I think the judgment should be affirmed.  The majority opinion lays too much stress on collateral issues.  My associates undertake to demonstrate that the testimony of the electrical engineer as to the carrying capacity of the pot holes between defendants' dam and plaintiffs' point of diversion, and the maximum flow of the creek amounts to no evidence at all. As to the maximum flow of the creek, that obviously is an immaterial matter so far as the questions involved are concerned. The capacity of the pot holes and their exact number were also immaterial matters.

It is true that the court found that there were about 275 pot holes having a combined capacity greater than the storage capacity of defendants' reservoir.  Appellants object to this finding on the ground that it is immaterial to the issues.  Obviously the exact number of pot holes and their exact retaining capacity are not of vital importance.  The important and undisputed facts are that there are many pot holes between defendants' reservoir and plaintiffs' point of diversion, and that it takes a substantial amount of water to fill them, and that no water reaches plaintiffs' point of diversion until after the pot holes are filled.  Obviously then, in light rainfalls, coming when the pot holes are dry or only partially filled, plaintiffs would get no water at the point of their diversion if the water was permitted to flow through defendants' reservoir.  It would flow into the

pot holes and be of no use to anyone. The only question here involved is whether, under such circumstances, defendants may impound the waters in their reservoir. That they may do so has been held by this court. (*Raymond* v. *Wimsette*, 12 Mont. 551, 31 Pac. 537, 33 Am. St. Rep. 604.) This is the rule elsewhere. (67 C. J. 1018; *Fenstermaker* v. *Jorgensen*, 53 Utah, 325, 178 Pac. 760; *Dern* v. *Tanner*, 60 Fed. (2d) 626.) My associates concede this to be the rule.

The difficulty in the case arises from the practical matter of ascertaining under existing conditions just how to determine in advance when defendants may impound the waters without injuring plaintiffs. The court expressly found that the evidence was insufficient upon which to make a determination of the question and reserved the matter for further hearing. It also expressly found that whenever there is sufficient volume of water in the creek at defendants' premises to reach the plaintiffs' point of diversion in any useful quantity up to 656 inches the defendants should provide a headgate or spillway so that the water would not be obstructed from reaching plaintiffs' premises. I think the court was correct in proceeding as it did. It recognized that it had two duties to perform. One was to protect plaintiffs in their prior right to 656 inches of water. The other was to prevent the waste of water so far as practicable. The fact that defendants did not prove what quantity of water on defendants' premises, if released, would reach plaintiffs' point of diversion in a useful quantity would not justify a holding that defendants could not impound any water under any circumstances. Certainly they could impound whatever excess was flowing over and above plaintiffs' 656 inches at plaintiffs' premises. Likewise they could impound such waters as clearly could not reach plaintiffs' point of diversion in any useful quantity.

The practical difficulty is to determine what amount of water flowing into defendants' reservoir at a given time would reach plaintiffs' point of diversion in a useful quantity if permitted to flow, or as stated in the opinion of the Chief Justice: When may defendants impound the waters without injury to plaintiffs?

To determine that question under varying conditions might require experimentation or demonstration in order to meet the rule followed in the *Raymond Case,* supra. Doubtful conditions should be resolved against defendants' right to impound (*Donich* v. *Johnson,* 77 Mont. 229, 250 Pac. 963.) It might require the services of a water commissioner to make these experiments. Certainly, defendants' failure at the supplemental hearing to prove what amount of water released at their dam would reach plaintiffs' premises in a useful quantity does not mean that waters in quantity which would never reach plaintiffs' premises must be permitted to flow to waste for all time. I think the court did right in reserving the question for further consideration. We should not presume in advance of a ruling by the trial court that it will not adequately protect every right of plaintiffs.

The practical way to protect plaintiffs in their prior right is to provide a method by which the water entering defendants' reservoir and impounded by them may be measured as it enters the reservoir at the time of every rainfall. Defendants must then be required to release that quantity of water if it cannot be shown by them that it would not reach plaintiffs' premises in useful quantities, if released. While this may require constant vigilance on the part of the interested parties and lead to some expense, the situation is no different from that in the case of any other water appropriator who must resort to contempt or other proceedings to protect his right if and when it is invaded by another.

The opinion written by the Chief Justice recognizes defendants' right to impound waters that cannot reach plaintiffs' point of diversion in useful quantities, but undertakes to say in effect that that issue must be litigated in a separate action rather than in this action, thus adding to the expense of litigation. I think the question was properly reserved by the court by motion in this action, thus saving to the litigants the cost of filing a separate action.

It is true the court stated that the question reserved was the right to determine later what amount of water at defendants'

premises is necessary to reach plaintiffs' point of diversion in useful quantity, but this is but the means of determining when defendants may impound the waters without injury to plaintiffs.

I think the judgment should be affirmed in its entirety.

Mr. Justice Morris:

I concur generally in the foregoing dissent of Mr. Justice Angstman, but desire to make some further observations.

The parties to this action were before this court in case No. 7796, decided June 9, 1938. (*Irion* v. *Hyde,* 107 Mont. 84, 81 Pac. (2d) 353.) In that case the defendant did not challenge prior appropriation by the plaintiff but set up superior right by adverse user. The trial court sustained such contention of the defendant and denied the plaintiff's application for an injunction. On appeal we reversed the district court on the question of the defendant's superior right by adverse user, but being unwilling to direct the destruction of defendant's dam, which plaintiff demanded, remanded the case for further proceedings. In the former case we found the plaintiff had the first right to 656 miner's inches of the waters of Sheep Creek. The water was diverted from the creek by a dam constructed for that purpose but which has no storage capacity of any consequence. Approximately 130 acres of plaintiff's land is capable of irrigation, and about 100 acres were usually irrigated prior to the time defendant constructed his storage dam. The defendant sought and obtained the consent of the plaintiff to build the dam and store water which was clearly a recognition of plaintiff's prior right. The obvious understanding was that the defendant might store such water as the plaintiff did not need or could not divert and apply to a beneficial use. This concession ultimately led to this controversy.

The evidence in the former action is, in so far as it relates to this action, substantially the same, and is, in effect, that there is no outlet to defendant's dam except the diversion ditch used to carry the stored water onto defendant's land; that no water passes the dam except such as finds its way back into the chan-

nel of the creek after it has been used to irrigate the defendant's land, some 35 acres. We remanded case No. 7796 in order that the trial court, the trier of the facts in all such cases, might order such further proceedings as he deemed essential to enable him to adjust the matter in accordance with the established rules upon which our opinion was grounded. We understood, of course, that the quick sand formation of the channel of the creek between defendant's storage dam and plaintiff's place of diversion, some nine miles apart, with some 275 pot holes between the two points, involved such difficulties in determining how much water would have to pass the defendant's dam before any useful quantity would reach plaintiff's diversion dam that the trial court would have to display the wisdom of a Solomon to reach any satisfactory conclusion, much less satisfy the litigants. It must be kept in mind that courts cannot save litigants such difficulties in carrying a decree of court into effect as it is obvious will be encountered in the case at bar. All that either the trial court or this court on appeal is empowered to do is to determine controversies between litigants according to the established rules of law, and when the particular controversy is determined such obligations as are placed upon the litigants must be discharged by them.

In the case at bar it is clear that the trial court earnestly attempted to bring about a fair and reasonable adjustment of the controversy, and in its conclusion No. III such an adjustment is outlined and the rights of the parties determined, but the decree, while giving full recognition to the prior right of the plaintiff, does not clearly set out just what the defendant shall do in order to assure the plaintiff against further invasion of his right by the defendant. The plaintiff is entitled to have the flow of water in the channel of the creek made free from every obstruction that impairs his right. The channel must be returned as near as practically possible to its condition before defendant's dam was built so far as the flow of the water is concerned; in order to do this an outlet should be built by the defendant at the bottom of his dam, through which any or all of the water he has impounded may be let down

the channel of the creek for the benefit of the plaintiff. This should be proceeded with upon the assumption that defendant's dam has obstructed the flow of the water to the injury of the plaintiff and the evidence so shows, and whether under such conditions as may exist at any particular time the amount of water that defendant lets down is sufficient to reach the plaintiff's place of diversion in any useful quantity is a question in the determination of which all doubts should be resolved in favor of the plaintiff and against the defendant. Such burden is properly imposed upon the defendant in view of the fact that from his acts alone all these questions that adversely affect plaintiff's right have arisen. It is in accordance with general practice for the owner of the prior right to water to turn the water into his own ditches when needed and shut off the flow being taken out by a junior appropriator, if the flow is insufficient for both and under the circumstances here involved I think it would be proper for the plaintiff to regulate the outlet in defendant's dam. Defendant did not assume the right to build the dam until he obtained the permission of the plaintiff thereby recognizing plaintiff's property right in the channel of the stream as the means of conveying the water to his diversion dam, and I am of the opinion that plaintiff acquired such right in the channel as entitled him to access to the channel to see that his prior right is not impaired, and for the further purpose of opening and closing the headgate or outlet in defendant's dam, taking care not to exercise such right to the extent that it would amount to trespass.

The defendant may not be required to release any water impounded out of the excess over the needs of the plaintiff. In such case water impounded takes on a character different from water diverted from a live stream. One who diverts water from a running stream has a property right in the use of such water only, but when water is legally impounded in a reservoir one who has captured it has a property right in the corpus, having as complete title thereto as to his cow or horse. Such water, being acquired, without invading another's right, need not be released, but in determining the amount so acquired that one

shall retain when additional water is impounded that the owner of the prior right wants and needs, a measuring device would have to be installed and the volume in the reservoir noted from time to time, and the amount impounded increased only when it could be impounded with the plaintiff's consent. Such conditions now imposed upon defendant would involve nothing more than the implied obligations he assumed to the plaintiff when he obtained the plaintiff's consent to construct the dam in the beginning.

Rehearing denied September 27, 1940.